# ELM CITY CHEESE COMPANY, INC., ET AL. *v.*
# MARK FEDERICO ET AL.
## (SC 15951)

Borden, Berdon, Katz, McDonald and Peters, Js.*

Argued June 4—officially released October 26, 1999

* The listing of justices reflects their seniority status on this court as of the date of argument.

*David T. Grudberg*, for the appellants (defendants).

*Barry J. Waters*, with whom were *Anthony J. Dolce* and, on the brief, *Rachel Snow Kindseth*, for the appellees (plaintiffs).

*Opinion*

KATZ J. The defendants, Mark Federico and Lomar Foods, Inc. (Lomar), appeal from a judgment enjoining them for a period of three years from disclosing, using or selling information found by the trial court to be a trade secret, which Federico learned throughout his association with the named plaintiff, Elm City Cheese Company, Inc. (Elm City),[1] and its owners, Richard and Suzanne Weinstein.[2] The principal issue before us is whether the facts found establish a trade secret as that

---

[1] The defendants also appeal from the trial court's judgment awarding Elm City compensatory and punitive damages, as well as attorney's fees.

[2] At the outset of the trial, Richard Weinstein was also a plaintiff in the case. At the conclusion of the plaintiffs' evidence, however, the trial court dismissed Richard Weinstein's claims, pursuant to Practice Book § 302, now § 15-8, for failure to present a prima facie case. We therefore refer to Elm City as the plaintiff.

term is defined in General Statutes § 35-51 (d).[3] We conclude that they do.

The trial court found the following facts, which are largely undisputed. The Weinsteins own Elm City, which has been manufacturing cheese since 1896, but has been making primarily grated cheese since the late 1950s. Elm City does not sell its products to the public; rather, it sells its Italian style grated cheese to three major customers that use Elm City's cheese as a "filler" to blend into their cheeses.[4]

Federico has known Richard Weinstein (Weinstein) since Federico was seven years old, and over the years, he developed a close social relationship with the Weinsteins. According to the trial court's findings, Federico "became [the Weinsteins'] most trusted adviser and confidant. Federico effectively became a member of the family, virtually the 'number one son.'" When Federico, a certified public accountant, was not given a partnership in the firm for which he was working, Weinstein encouraged him to start his own firm and Elm City became one of his first clients. From 1982 to 1994, Federico served as both Elm City's accountant and the Weinsteins' personal accountant. When, in 1988, Weinstein learned that he had chronic lymphocytic leukemia, Federico became increasingly more involved in

---

[3] General Statutes § 35-51 (d) provides that " 'trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

Although minor changes have been made to § 35-51 since 1995, those changes are not relevant to the present case. References herein are to the current revision.

[4] Although Elm City actually sells some of its product to a fourth customer, that customer accounts for such a small percentage of Elm City's sales as to be of no legal significance to this appeal.

the operation of the business. He was also named executor of Weinstein's will.

The trial court found, further, that Federico's duties went beyond typical accounting work. For example, in the early 1980s, he was involved in efforts to solve an odor control problem in the plant. An engineer who was not an employee of Elm City eventually solved this problem by installing certain dehumidification equipment. This solution provided the additional and unexpected benefit of decreasing the time required to remove moisture from Elm City's cheese, thereby allowing Elm City to produce its product more quickly.

The trial court found that, eventually, Federico was given keys to the building and access to the alarm system. When the Weinsteins were away, Federico was placed in charge of operations and was given the authority to make decisions. In February, 1992, Federico was made a vice president of the company and was given signatory power over the company checkbook. Although he was involved in projects for Elm City that were outside of the accounting area, even after he became vice president, he nevertheless spent four days each week at his accounting firm. In October, 1993, he became a full-time employee of Elm City and was placed in charge of the day-to-day operations of the plant. He continued to serve as Elm City's accountant, however, and also serviced other clients of his accounting firm.

The trial court also found that Federico learned the different aspects of Elm City's operation at various times during his association with Weinstein. For example, he first learned the identity of Elm City's biggest customer when he was a young boy. Later, in the late 1970s, before he became a certified public accountant, he did some payroll work for the company. He and Weinstein would talk about the business. During this

time, Federico learned that Elm City used "return milk"[5] as its principal raw material for cheese production. According to the trial court, "Federico had learned long before he became [a full-time] employee . . . all aspects of Elm City's business including its method of cheese production, its customers and suppliers, its methods for drying cheese, and the prices it paid for supplies and charged for finished product." The court found: "Because of his role as Elm City's 'right hand man,' which grew out of his role as [accountant], Federico learned every financial aspect of Elm City's business. He knew, for example, what [Elm City] paid [its suppliers] for return[ed] milk and what [Elm City] charged its three customers . . . for Italian style grated cheese. He also became involved in every aspect of Elm City's business, including, but not limited to: its unique processes and techniques in making grated cheese; its pricing and cost structures; and its suppliers and customer relationships. He did financial projections, he kept journals on the milk suppliers and tracked the amount of milk [Elm City] ordered (and the price it paid) in Elm City's milk logs and accounts payable journal. Before Federico assumed these responsibilities, only the Weinsteins themselves were privy to these financial aspects of the business, as the financial record-keeping was primarily [Suzanne Weinstein's] job, with some assistance from Weinstein." (Internal quotation marks omitted.) The court noted that "[a]lthough Federico may have learned some aspects of Elm City's methods of production, etc., while an employee, all the important intricate components of Elm City's business

---

[5] "Return" or "returned" milk is milk that is returned, unsold, to dairy plants from sellers, such as supermarkets, generally because its sale date has passed. Because this returned milk is not subject to federal price regulations, it is generally available at lower prices than "class milk," such as grade A milk, which is subject to such regulations. Weinstein testified that he was able to purchase returned milk for approximately one half of the price of class milk.

became fully known to Federico when he served as [an accountant] for Elm City and the Weinsteins." Federico prepared monthly statements for Elm City from 1982 to 1994. According to the trial court, these statements, which Federico prepared both before and after he had become an employee of Elm City in October, 1993, contained the type of information that a client would expect an accountant to keep confidential, particularly from potential competitors of Elm City.

The trial court found that, by 1994, the relationship between Federico and Weinstein had started to deteriorate. Weinstein became increasingly unhappy with Federico's indulgence of his family, several members of which Elm City employed at Federico's request.[6] Federico, by contrast, claimed that his ultimate decision to leave Elm City was because Weinstein had reneged on an agreement to sell Elm City to Federico. Weinstein denied that they ever had a contract for the sale of the business.

The trial court found further that, in mid-December, 1994, Weinstein told Federico that he would divide Elm City's profits evenly with Federico, as Weinstein's father had done with him. Shortly thereafter, in late December, Federico assured Weinstein that he intended to stay in the business. Nevertheless, on January 3, 1995, shortly after profits had been distributed, Federico gave Weinstein two letters of resignation, one as his employee and the other as his accountant.

---

[6] According to the trial court, Elm City employed Federico's father, whose duties were minor when compared with his large salary, and Federico's brother, whose weekly pay increased from $150 to $800 in a very short period of time. Additionally, in order to divert some income from Federico's father so as to allow him to collect social security benefits, Elm City carried Federico's mother on its payroll, even though she worked for Federico's uncle rather than for Elm City. This scheme resulted in Elm City having to pay $18,000 in penalties and interest after an audit by the Internal Revenue Service.

The trial court found that Federico then returned to his accounting practice for a brief period. In October, 1995, he attended a four day course in cheesemaking. In November of that same year, he attended a conference in Chicago that was attended by two of Elm City's three largest customers. Soon thereafter, Federico applied to a bank for a loan to start Lomar, the other defendant in this appeal. The business plan submitted to the bank by Federico, developed in November, 1995, duplicated Elm City's business, including the process for making the cheese, which Weinstein had developed over several years. According to the trial court, Lomar intended to manufacture the same product that Elm City manufactures, by the same process, and sell it to Elm City's customers.

In November, 1996, Lomar began operations at the site of a former dairy located in Providence, Rhode Island. At trial, Federico admitted that Lomar followed the basic production method used by Elm City. It bought its supplies from some of the same suppliers used by Elm City, and it sold its finished products to the same customers that Elm City did. Additional facts will be set forth as needed.

On December 20, 1996, Elm City brought an action seeking temporary and permanent injunctions, as well as damages.[7] At trial, Elm City alleged five causes of action: (1) breach of fiduciary duty; (2) misappropriation of trade secrets;[8] (3) violation of the Connecticut

[7] The parties agreed to consolidate Elm City's motion for a temporary injunction with its claim for a permanent injunction and damages.

[8] General Statutes § 35-51, which defines terms used in the Uniform Trade Secrets Act, provides in its entirety: "Definitions. As used in this chapter, unless the context requires otherwise:

"(a) 'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means, including searching through trash.

"(b) 'Misappropriation' means: (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used

Unfair Trade Practices Act (CUTPA);[9] (4) misrepresentation; and (5) conversion. The trial court found for Elm City on the first, second and third counts, and for the defendants on the two remaining counts. The court concluded, however, that Elm City's claims were governed by General Statutes § 35-57 (a), which provides in relevant part that, "[u]nless otherwise agreed by the parties, the provisions of [the Uniform Trade Secrets Act (trade secrets act); General Statutes § 35-50 et seq.] supersede any conflicting tort, restitutionary, or other law of this state pertaining to civil liability for misappropriation of a trade secret."[10] Therefore, the court enjoined the defendants, under the second count—the trade secret count—for a period of three years, "from disclosing, using or selling any of [Elm City's] confidential customer information, trade secrets, procedures,

---

improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, including but not limited to disclosures made under section 1-210, sections 31-40j to 31-40p, inclusive, or subsection (c) of section 12-62; or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

"(c) 'Person' means a natural person, corporation, limited liability company, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity.

"(d) Notwithstanding the provisions of sections 1-210, 31-40j to 31-40p, inclusive, and subsection (c) of section 12-62, 'trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

[9] General Statutes § 42-110a et seq.

[10] Although a minor technical change was made to § 35-57 in 1995, in the interest of clarity, references herein are to the current revision.

technical data or know-how relating to the products, processes, methods, research and development plans, equipment or business operations of [Elm City]."

In addition to the injunctive relief, the trial court awarded Elm City compensatory damages in the amount of $461,239, and, based upon its finding that the defendants had wilfully and maliciously misappropriated Elm City's trade secrets, the court awarded Elm City $300,000 in punitive damages, pursuant to General Statutes § 35-53 (b).[11] Subsequently, the trial court, in a second memorandum of decision, awarded Elm City $100,000 in attorney's fees, pursuant to General Statutes § 35-54.[12] The defendants appealed to the Appellate Court from the judgment of the trial court and, pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c), we transferred the appeal to this court.

On appeal, the defendants make several claims. First, they claim that the trial court improperly concluded that Elm City's process for making cheese was a trade secret entitled to protection under the trade secrets act. Second, they argue that the trial court improperly found the defendants' conduct wilful and malicious and, accordingly, improperly awarded punitive damages and attorney's fees. Finally, they argue that the injunction fashioned by the trial court should be vacated on the grounds that it is not narrowly tailored to protect Elm City's trade secrets, and it does not adequately inform the defendants as to the restrictions on their conduct. We are not persuaded by the defendants' arguments and, therefore, we affirm the trial court's judgment.[13]

---

[11] See footnote 30 of this opinion for the text of § 35-53 (b).

[12] See footnote 31 of this opinion for the text of § 35-54.

[13] Elm City advances the following alternate grounds for affirmance: (1) the defendants engaged in unfair competition in violation of CUTPA; and (2) Federico breached his fiduciary duty to Elm City. Because we affirm the judgment of the trial court on the trade secret claim, we need not consider these alternate grounds.

I

Before we address the parties' arguments, we set forth the standard of review applicable to this appeal. The question of whether information sought to be protected by the trade secrets act rises to the level of a trade secret is "one of fact for the trial court."[14] *Allen Mfg. Co.* v. *Loika*, 145 Conn. 509, 516, 144 A.2d 306 (1958).[15] "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980). . . . In other words, to the extent that the trial court has made findings of fact, our review is limited to deciding whether those findings were clearly erroneous." (Citation omitted; internal quotation marks omitted.) *State* v. *Velasco*, 248 Conn. 183, 188–89, 728 A.2d 493 (1999); see also *Robert W. Weiss & Associates, Inc.*

[14] For authority from other jurisdictions supporting this proposition, see, for example, *Rockwell Graphic Systems, Inc.* v. *DEV Industries, Inc.*, 925 F.2d 174, 180 (7th Cir. 1991) (applying Illinois law); *Chevron U.S.A., Inc.* v. *Roxen Service, Inc.*, 813 F.2d 26, 29 (2d Cir. 1987) (applying New York law); *Lear Siegler, Inc.* v. *Ark-Ell Springs, Inc.*, 569 F.2d 286, 288–89 (5th Cir. 1978) (applying Mississippi law); *Valco Cincinnati, Inc.* v. *N & D Machining Service, Inc.*, 24 Ohio St. 3d 41, 47, 492 N.E.2d 814 (1986); *West Mountain Poultry Co.* v. *Gress*, 309 Pa. Super. 361, 364, 455 A.2d 651 (1982).

[15] According to the Restatement (Third), Unfair Competition, Appropriation of Trade Values § 39, p. 445, reporters' note (1995): "The conclusion of the fact-finder as to the existence of a trade secret is entitled on appeal to the usual deference accorded findings of fact. See, e.g., *Defiance Button Machine Co.* v. *C & C Metal Products Corp.*, 759 F.2d 1053 (2d Cir.), cert. denied, 474 U.S. 844, 106 S. Ct. 131, 88 L. Ed. 2d 108 (1985); *Syntex Ophthalmics, Inc.* v. *Novicky*, 745 F.2d 1423 (Fed. Cir. 1984), vacated on other grounds, 470 U.S. 1047, 105 S. Ct. 1740, 84 L. Ed. 2d 807 (1985), reinstated, 767 F.2d 901 (Fed. Cir. 1985), cert. denied, 475 U.S. 1083, 106 S. Ct. 1463, 89 L. Ed. 2d 719 (1986); *Zoecon Industries* v. *American Stockman Tag Co.*, 713 F.2d 1174 (5th Cir. 1983); *Saunders* v. *Florence Enameling Co.*, 540 So. 2d 651 (Ala. 1988)."

v. *Wiederlight*, 208 Conn. 525, 539, 546 A.2d 216 (1988) (applying clearly erroneous standard in upholding trial court's conclusion that customer list and related insurance information were not trade secrets).[16]

## II

·We begin our analysis by restating some basic principles of the law governing trade secrets. Generally speaking, in the absence of a restrictive covenant, a former employee may compete with his or her former employer upon termination of employment. *Town & Country House & Home Service, Inc.* v. *Evans*, 150 Conn. 314, 317, 189 A.2d 390 (1963). Even after the employment has ceased, however, "the employee remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer." *Allen Mfg. Co.* v. *Loika*, supra, 145 Conn. 514.

According to § 35-51 (d), a trade secret is "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by

---

[16] The defendants assert that whether reasonable efforts were made to maintain the secrecy of the trade secret at issue is a mixed question of fact and law over which this court should exercise plenary review. In support for this assertion, the defendants note that Elm City, in claiming that the clearly erroneous standard governs, relied upon, inter alia, *Allen Mfg. Co.* v. *Loika*, supra, 145 Conn. 516, which was decided before the enactment of current Practice Book § 60-5, formerly § 4061, which permits this court to reverse or modify the decision of the trial court if we determine that the factual findings are clearly erroneous or if "the decision is otherwise erroneous in law." The defendants fail to note, however, that this court also applied the clearly erroneous standard in *Robert W. Weiss & Associates, Inc.* v. *Wiederlight*, supra, 208 Conn. 539, which was decided in 1988, a decade after the enactment of § 4061 in 1978. We reaffirm that this standard is the appropriate one to apply in a trade secrets appeal such as the present one.

proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

Turning to the appeal before us, "[a] primary issue to be determined . . . is whether there is a trade secret existing which is to be protected." *Plastic & Metal Fabricators, Inc.* v. *Roy*, 163 Conn. 257, 267, 303 A.2d 725 (1972). Essentially, according to § 35-51 (d), in addition to the two enumerated requirements, to constitute a trade secret, information must be of the kind included in the nonexhaustive list contained in the statute. The first step in our analysis, therefore, is a determination of whether the information at issue satisfies this threshold requirement. To do so, we must first identify the information that the trial court found to be a trade secret.

## A

The defendants claim that the trial court improperly found that Elm City's process for making cheese is a protectable trade secret. We note, however, that although the defendant focuses on the reasons the *process* may or may not be a trade secret, we believe that the trial court's findings warrant a broader reading. Our reading of the trial court's memorandum of decision leads us to conclude that, in addition to Elm City's cheesemaking process, the trade secret, as found by the trial court, encompasses Elm City's customer list and certain financial information—including its product pricing structure, and list of suppliers and the prices paid for its supplies.

It is true that the trial court stated that "this court . . . finds that the overall way that Elm City makes its type of 'Italian Style Grated Cheese,' i.e., the quick drying and the use of return milk, gives it an economic advantage [and] is a trade secret." Additionally, the trial court stated that "Elm City had a unique way to produce

its cheese product and the combination of factors that produce its cheese is a trade secret." A careful examination of the trial court's memorandum of decision compels us to conclude that the trial court's findings regarding the scope of Elm City's trade secret go well beyond the cheesemaking process.

Recognizing that § 35-51 (d) (2) requires that the party seeking trade secret protection must have taken efforts to maintain the secrecy of the information sought to be protected that are reasonable under the circumstances, the trial court found that Elm City took such efforts "to maintain the secrecy of its production." Rather than merely list the steps that Elm City took to protect the secrecy of its cheesemaking process, however, the trial court also stated that "there is no evidence that the formula, methods of production, sales to selected customers or other business related information was open to the public, or generally known by other employees [other than Federico]." Additionally, two paragraphs later in its memorandum of decision, noting that Elm City had argued that what should be considered "reasonable efforts" for a family operation differs from what should be so considered for a large, sophisticated corporation, the trial court discussed the fact that "all information was kept confidential and shared only by family members and one other, Federico, who was more than a family member in the eyes of the Weinsteins and [was] their personal accountant." The trial court immediately followed this statement with a discussion of the financial information that Federico, as an accountant, was bound, by both statute and the ethical code of his profession, not to disclose. The court noted that "all the information as regards customers, pricing, suppliers, costs and everything intended to be held confidential was learned by Federico . . . ." Finally, we note that the trial court enjoined the defendants from "disclosing, using or selling any of Elm City Cheeses,

confidential customer information, trade secrets, proce-
dures, technical data or know-how relating to the prod-
ucts, processes, methods, research and development
plans, equipment or business operations of [Elm
City]."[17]

Although the defendants sought an articulation of the
trial court's findings with respect to "the scope of the
court's trade secret ruling," they failed to seek a review
of the denial of their motion for articulation. "In the
absence of [a more complete] record, we presume that
the trial court, in rendering its judgment in favor of the
plaintiffs, undertook the proper analysis of the law and
the facts. *DiBella* v. *Widlitz*, [207 Conn. 194, 203, 541
A.2d 91 (1988)]; *Timm* v. *Timm*, 195 Conn. 202, 206,
487 A.2d 191 (1985)." *S & S Tobacco & Candy Co.* v.
*Greater New York Mutual Ins. Co.*, 224 Conn. 313, 321–
22, 617 A.2d 1388 (1992). Moreover, the trial court's
memorandum of decision as a whole demonstrates an
understanding of § 35-51 (d). We can conceive of no
reason, therefore, for the trial court to have discussed
financial information—including pricing data, supply
information and customer lists—with respect to reason-
able efforts to maintain the secrecy of information

---

[17] We recognize that it could be argued that the trial court's inclusion of
the phrase "trade secrets" in this list could be construed as an indication
that the trade secret at issue must be something other than the confidential
or business information listed because, otherwise, the injunction would be
redundant. This argument is unpersuasive, however, in light of the fact that
the trial court also included in the same list, "procedures, technical data or
know-how relating to the products, *processes, [and] methods*" employed
by Elm City. (Emphasis added.) There is no dispute that such information
was considered by the trial court to be part of the trade secret. We conclude,
therefore, that, just as the inclusion of "processes" and "methods" is not
redundant of "trade secrets," neither is the inclusion of the confidential or
business-related information. The trial court's inclusion of the phrase "trade
secrets," therefore, does not exclude from the definition of that phrase any
of the other information listed in the injunction. Rather, it is likely that the
inclusion of the term is a result of the trial court's desire to create as
complete a list as was possible.

sought to be protected as a trade secret, absent the court's belief that such information is part of the trade secret.

The foregoing leads us to conclude that the trial court found Elm City's business operations—from the specific sources and costs of its supplies, through the production of its cheese, to the distribution of its product to three specific customers and the prices charged them—to be a protectable trade secret.[18] We are *not* saying, however, that each and every component is necessarily a trade secret in and of itself—although the trial court specifically found that the cheesemaking process is a trade secret. In other words, we are not finding, for example, the customer list, the list of suppliers or the pricing data to be trade secrets. Such factual findings are not ours to make; rather, they fall within the province of the trial court. See, e.g., *Bornemann* v. *Bornemann*, 245 Conn. 508, 527, 752 A.2d 978 (1998); *Herbert S. Newman & Partners, P.C.* v. *CFC Construction Ltd. Partnership*, 236 Conn. 750, 762, 674 A.2d 1313 (1996); *Commissioner of Health Services* v. *Youth Challenge of Greater Hartford, Inc.*, 219 Conn. 657, 666, 594 A.2d 958 (1991). In this case, we are merely interpreting the trial court's findings to include such components within the scope of Elm City's trade secret.

---

[18] The defendants even seem to acknowledge that the trade secret encompasses more than merely the cheesemaking process itself. In their original brief, in support of their assertion that Elm City did not take sufficient measures to maintain secrecy, the defendants note that Elm City "made no effort to conceal the identity of milk suppliers or cheese customers from its employees . . . ." Additionally, in their reply brief, the defendants claim that "the essential elements of [Elm City's] business—how to make the cheese, where to buy the milk, where to sell the cheese—were known to hundreds of employees. . . . [Elm City] gave no indication to any employee that its customers, suppliers, or [cheesemaking] procedure were secret." By including the supplier and customer information in its list of information that it argues Elm City should have kept secret, the defendants imply that such information is part of the trade secret at issue.

Having identified the information that constitutes the trade secret at issue, we must now determine whether that information is of the kind that, assuming the requirements § 35-51 (d) (1) and (2) are met, can be considered a trade secret under the trade secrets act. Section 35-51 (d) provides in part that " 'trade secret' means information, including a formula, pattern, compilation, program, device, *method*, technique, process, drawing, cost data or customer list . . . ." (Emphasis added.) Therefore, if we read broadly the term "method," so as to include Elm City's method of doing business, we find the trial court's finding supported by the statute. We need not rest, however, solely on this broad reading.

As noted above, the nonexhaustive list contained in § 35-51 (d), in addition to "method," includes "technique, process . . . cost data [and] customer list . . . ." Therefore, the statute clearly provides that virtually every one of the individual components of Elm City's trade secret, under the appropriate circumstances, could be considered a trade secret in and of itself. Moreover, this proposition finds support in this court's case law. For example, Elm City's list of suppliers and the costs it paid for its supplies could be found to be trade secrets. See *Triangle Sheet Metal Works, Inc.* v. *Silver*, 154 Conn. 116, 126, 222 A.2d 220 (1966) ("financial details of [the plaintiff's] costs, pricing and bidding" are trade secrets); see also 1 R. Milgrim, Trade Secrets (1999) § 1.09 [8] [b], pp. 1-461 through 1-468. As for the manufacturing process itself, the trial court expressly found that it was entitled to trade secret protection. In so doing, the court relied on this court's opinion in *Allen Mfg. Co.* v. *Loika*, supra, 145 Conn. 515, in which we concluded that, despite the fact that the specific materials used in the plaintiff's manufacture of screws were common, commercially available components, the "plaintiff's ability to combine these elements into a successful . . . process, like the creation

of a recipe from common cooking ingredients, is a trade secret entitled to protection." (Internal quotation marks omitted.) In *Allen Mfg. Co.*, we noted that "[t]he fact that every ingredient is known to the industry is not controlling for the secret may consist of the method of combining them which produces a product superior to that of competitors." (Internal quotation marks omitted.) Id. Finally, we note that customer lists can also be found to be trade secrets. See, e.g., *Town & Country House & Homes Service, Inc.* v. *Evans*, supra, 150 Conn. 319 ("[a] list of customers, if their trade and patronage have been secured by years of business effort and advertising and the expenditure of time and money, constitutes an important part of a business and is in the nature of a trade secret"). The foregoing supports the trial court's finding that the business plan as a whole merits trade secret protection.

Although our conclusion as to the breadth of the trial court's identification of Elm City's trade secret can be supported by a broad reading of the term "method" in § 35-51 (d), and, according to both § 35-51 (d) and our case law, each essential component of Elm City's trade secret could itself be considered a trade secret under the appropriate circumstances, we have found very little other authority, either from our state or from foreign jurisdictions, for the proposition that such individual components, *together*, can constitute a trade secret.[19]

---

[19] We have found two cases in which courts have considered several components of a business to be a trade secret. For example, in *Clark* v. *Bunker*, 453 F.2d 1006, 1008 (9th Cir. 1972), the United States Court of Appeals for the Ninth Circuit affirmed the District Court's finding that "a detailed plan for the creation, promotion, financing, and sale of contracts for 'prepaid' or 'pre-need' funeral services" was entitled to trade secret protection. "The plan . . . encompassed all of the forms, information, and techniques, for formulating, promoting, financing, and selling contracts for 'prepaid' funeral services in the continuous operation of a mortician's business." Id., 1009.

Another example can be found in *California Intelligence Bureau* v. *Cunningham*, 83 Cal. App. 2d 197, 199, 188 P.2d 303 (1948), which involved a business that consisted of procuring, digesting and analyzing information

Significantly, however, we have found even less authority contrary to this proposition.[20] We conclude, therefore, in light of the unique combination of the components at issue, that the aforementioned individual components, viewed in conjunction with each other, can be considered a trade secret under the specific circumstances of this case.

Central to the trial court's ultimate finding that Elm City's business plan constitutes a trade secret, is the

---

concerning solicitations of funds for, generally, charitable and philanthropic purposes, and distributing, by bulletin, information to subscribers for the purpose of protecting those subscribers from "false, fraudulent and unworthy" solicitations. In determining that the method of operating the business was a trade secret, the court stated: "During the many years [the] plaintiff has been in business it has acquired and retains a vast amount of information relative to those who solicit funds. It knows the worthy and the unworthy. It has developed superior methods of investigation of newcomers in the field. It has evolved methods of analyzing and digesting the results of its investigations. It tersely supplies its conclusions to its subscribers. . . . *All of this, including [the] plaintiff's list of subscribers, is a trade secret,* confidential information, property of [the] plaintiff. [The] [p]laintiff's list of customers is a preferred list, a list of persons, firms and corporations willing to pay for confidential, difficult to obtain, information about persons soliciting funds." (Emphasis added.) Id., 204.

It is noteworthy that the courts deciding these cases did not parse out the business plans at issue, even though they listed the components of them, in order to determine whether each component was a trade secret. Rather, in each case, the overall plan itself was found to be a trade secret. We view the plans at issue in these cases as sufficiently analogous to Elm City's overall business plan so as to provide a measure of support for our conclusion.

[20] The extent of the authority we found contrary to our proposition can be found in 1 R. Milgrim, supra, § 1.09 [8] [d], p. 1-470, in which the author states that systems and methods "may be entitled to protection but might be so all-embracing with reference to any given enterprise that it would amount to protection of the business rather than the 'secrets.' " The author provides no authority, however, to support this sentence. The author then notes that "[c]ases denying this class of matter protection, however, do not carefully analyze why relief has not been granted." Id., pp. 1-470 through 1-471. We have examined every case cited in relation to this sentence and have uncovered none in which a court expressly held that several components of a business, each of which, under the appropriate circumstances, could be deemed a trade secret, could not, taken together, constitute a trade secret. Milgrim does cite one case, however, in which the court found to

court's finding that Elm City's business is unique.[21] If the business were not unique—that is, if both the individual components of Elm City's business plan, and the way in which those components are combined, were generally known—Elm City arguably would not be entitled to trade secret protection because its information would not meet the statutory requirements of § 35-51 (d). Federico himself testified, however, that Elm City occupied a specialized niche in the cheesemaking industry. As

the contrary, which bolsters our conclusion. See *Clark* v. *Bunker*, 453 F.2d 1006, 1008 (9th Cir. 1972), discussed in footnote 19 of this opinion.

[21] In finding that Elm City's method of cheese production is unique, the trial court relied in part on the expert testimony of Robert Bradley, a professor of food sciences at the University of Wisconsin, who testified that, in his opinion, the method is "very unique." The trial court also had available to it voluminous testimony from others about the uniqueness of the process. Although there was testimony about several stages of the process that Elm City claims make it unique, such as the cutting of curd into small pieces and the use of certain drying containers, the court focused primarily on two key components of Elm City's process that were the subjects of lengthier discussion at trial than were others.

The first component cited by the trial court is Elm City's use of returned milk, which, according to Weinstein's testimony, is unique in the cheesemaking industry with respect to the manufacture of grated cheese. It was undisputed that the use of returned milk makes the production of the cheese much less costly. Indeed, Weinstein testified that if Elm City's exact process were followed but milk bought at normal supply prices was substituted for returned milk, Elm City's cheesemaking process would not be profitable.

The second main factor contributing to the uniqueness of Elm City's process cited by the trial court is the way in which the company rapidly dries the cheese through a technique developed specifically for Elm City. True parmesan cheese takes a minimum of ten months to cure. See 21 C.F.R. § 133.165 (a) (1999). Elm City's product, which is not a true parmesan cheese but is, rather, sold to other cheesemakers to use as "filler" in their cheeses, is dried in a matter of weeks. The process Elm City employed immediately prior to 1985 gave rise to an odor problem within the plant. Federico was involved in efforts to solve the problem, which was eventually solved by an engineer who testified at trial, Alex Semeomirsky—whose name is spelled "Sandomirsky" in the trial court's memorandum of decision. The solution entailed the installation and use of dehumidification components, an air handler, a chiller and a water tower. This solution not only alleviated the odor control problem, but had the unexpected but beneficial effect of accelerating the removal of moisture from Elm City's product, thereby allowing Elm City to produce its cheese more quickly to its economic advantage.

the trial court found, Elm City's operation "was a tailor-made business for three customers who took all their product." Elm City does not sell directly to the public. Rather, its cheese is used as a filler in other cheesemakers' products. In light of the fact that each component of Elm City's business method, under the appropriate circumstances, could be considered a trade secret, and, more importantly, in consideration of the unique relationship between Elm City and its suppliers and customers, we conclude that it was appropriate for the trial court to consider Elm City's business method, as a whole—that is, its purchase of returned milk from a very limited number of suppliers, its production from that milk of exclusively hard grated cheese through a unique process, and its sale of its product exclusively to three cheesemakers to blend into their cheeses—to be entitled to trade secret protection, provided that the requirements of subdivisions (1) and (2) of § 35-51 (d) are met.

Relying on those subdivisions, the defendants correctly state that "even if the information at issue falls into the category of possible trade secrets," the party claiming trade secret protection must prove that the information: (1) is of independent economic value; and (2) was the subject of reasonable efforts to maintain its secrecy. According to the defendants, Elm City's trade secret fails to meet these requirements. Because the defendants address subdivision (2) of § 35-51 (d) first, and devote significantly more attention to it, we consider that subdivision first as well.

B

Section 35-51 (d) (2) requires that information sought to be protected be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." The defendants argue that there is no evidence that the plaintiff "had taken any of the measures commonly

required to preserve the secret status of a business operation." We conclude that the trial court's finding that Elm City's efforts to maintain the secrecy of its trade secret were reasonable under the circumstances was not clearly erroneous. See *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra, 181 Conn. 221–22.

Citing a leading commentator on trade secret law, the defendants note that reasonable efforts to maintain secrecy "often include some of the following techniques: requiring employees to sign confidentiality agreements or otherwise advising them of the confidential nature of the process; posting of warning or cautionary signs, or placing legends on documents; taking precautions regarding visitors, by requiring them to sign confidentiality agreements, having them sign in, and shielding the process from their view; segregating information, so that no one person or written source discloses the entire manufacturing process; and using unnamed or coded ingredients."[22] See 1 R. Milgrim, supra, § 1.04, pp. 1-178 through 1-189. Additionally, the defendants cite four cases from other jurisdictions, including one from the United States District Court for the District of Connecticut, in which courts found that reasonable efforts had been taken to maintain the secrecy of the trade secrets at issue because the parties seeking trade secret protection had employed some of the aforementioned measures.[23]

---

[22] We note that the defendants exclude from their list a method cited in the treatise that Elm City *did* employ—that is, "[k]eeping secret documents under lock." See 1 R. Milgrim, supra, § 1.04, p. 1-188. For a discussion of Elm City's efforts in this regard, see the remainder of part II B of this opinion.

[23] The defendants cite *Uncle B's Bakery, Inc.* v. *O'Rourke,* 920 F. Sup. 1405, 1413–15, 1429, modified, 938 F. Sup. 1450 (N.D. Iowa 1996) (reasonable measures to maintain secrecy of bagel recipe and sealing process found where all visitors signed confidentiality agreements, and all employees signed nondisclosure agreements); *Hexacomb Corp.* v. *GTW Enterprises, Inc.,* 875 F. Sup. 457, 461 (N.D. Ill. 1993) (reasonable measures to maintain secrecy of honeycomb paper manufacturing process found where visitors required to obtain pass and agree not to divulge information obtained in plant, machines covered, and employees reminded of confidentiality of man-

It is important to note, however, that the measures cited in the Milgrim treatise are merely examples of the types of actions that may be considered, under the appropriate circumstances, to be reasonable efforts to maintain secrecy. They do not provide a standard that we must observe. Likewise, the cases cited by the defendants merely demonstrate how, in specific circumstances, a party has protected the secrecy of its trade secrets. The courts in those cases did not attempt to delineate precisely what minimum amount of effort they deemed sufficient to invoke the protection of the relevant trade secret statutes.

The question of whether, in a specific case, a party has made reasonable efforts to maintain the secrecy of a purported trade secret is by nature a highly fact-specific inquiry. *Nationwide Mutual Ins. Co.* v. *Stenger*, 695 F. Sup. 688, 691 (D. Conn. 1988). What may be adequate under the peculiar facts of one case might be considered inadequate under the facts of another. According to § 35-51 (d) (2), the efforts need only be "reasonable *under the circumstances* . . . ." (Emphasis added.)

The defendants assert that Elm City had no confidentiality agreements with their employees; its written employee manual makes no mention of confidentiality or nondisclosure policies or guidelines; most employees of the company have become familiar with all aspects

---

ufacturing process in exit interviews); *Gillette Co.* v. *Williams*, 360 F. Sup. 1171, 1176 (D. Conn. 1973) (reasonable measures to maintain secrecy of wet shave manufacturing process found where visitors signed in at plant, some reports marked confidential, and employees signed nondisclosure agreements); *Sun Dial Corp.* v. *Rideout*, 16 N.J. 252, 258–59, 108 A.2d 442 (1954) (reasonable measures to maintain secrecy of dial and panel manufacturing process found where plaintiff posted "no admittance" sign at entry of plant, employees told that process was secret, and visitors signed nondisclosure agreement).

of the cheesemaking process;[24] the cheese production equipment was in plain view of anyone inside the plant;[25] the thermostat displaying the temperature in the drying rooms was also in plain view; and Elm City made no effort to conceal from its employees the identity of its milk suppliers or cheese customers.

Having concluded that the trade secret at issue is Elm City's entire business plan, from the purchase of supplies to the sale of its cheese, we need not determine whether the cheesemaking process itself was subject to adequate efforts to maintain secrecy so as to satisfy § 35-51 (d) (2). We conclude that so long as Elm City

[24] In his testimony, Weinstein disputed this contention. For example, he testified that none of Elm City's nonsupervisory employees had access to the cheesemaking process in its entirety. According to Weinstein, only supervisory personnel have been allowed to add certain ingredients to the milk used for making the company's cheese, and, since the late or mid-1980s, those ingredients have been kept in a refrigerated truck under lock and key. Weinstein also testified that Elm City's employees were familiar with "[d]ifferent stages of making cheese and not from beginning to end." The trial court properly could have credited this testimony. See *State* v. *Trine*, 236 Conn. 216, 227, 673 A.2d 1098 (1996) ("[t]he determination of a witness' credibility is the special function of the trial court"). Additionally, we note that such segregation of information—that is, the withholding of certain information necessary to the procedure as a whole—is listed in Milgrim's treatise, cited by the defendant, as a method of maintaining secrecy that has been recognized by courts. See 1 R. Milgrim, supra, § 1.04, p. 1-186 (including "[m]aintaining internal secrecy by dividing the process into steps" in list of techniques adopted to protect secrecy on which courts have focused).

[25] In addition to the defendants' argument that employees had access to Elm City's process, the defendants also note that delivery truck drivers would sometimes enter the plant and were not barred from the production floor, and visitors were not barred from the plant. Weinstein testified, however, that, although there was "nothing in writing, [he has] told [Elm City's] supervisors to keep unauthorized people out of the plant verbally." If credited, this testimony indicates an effort to maintain secrecy with respect to truck drivers and persons not employed by Elm City. Moreover, we agree with the trial court that such persons, including truck drivers, who are not in the cheesemaking business, would not be in a position to "gain enough knowledge to compete [with Elm City] . . . ." We focus our attention, therefore, on Elm City's employees, who were in a better position to do so.

kept confidential enough information to make it virtually impossible for its employees to use the rest of the information constituting its trade secret, a trier of fact reasonably could find that, under the circumstances, its methods of maintaining secrecy complied with the demands of the statute.

The trial court found that all sensitive financial information "was kept confidential and shared only by family members and one other, Federico, who was more than a family member in the eyes of the Weinsteins and [was] their personal accountant." Weinstein testified that the books and records pertaining to Elm City's business were kept in a locked safe in a locked office with a monitored burglar alarm system, until the company was burglarized and the safe destroyed. Thereafter, the records were kept in an alarmed office in a separate building from Elm City's physical plant, in locked cabinets, to which only the Weinsteins, Federico, and Federico's father, whom Federico had hired, had access.

Accordingly, the trial court found that all employees other than Federico "did not have sufficient exposure to all the integral parts of Elm City's business to go out and compete. . . . [T]here is no evidence that the formula, methods of production, sales to selected customers or other business related information was open to the public, or generally known by other employees." According to the trial court, therefore, no one but Federico had access to enough information, in conjunction with the cheesemaking process, to be able to compete with Elm City.

As noted previously, Elm City created a unique niche for itself in the cheesemaking industry. It tailored its operation to please primarily three customers and, therefore, its success depended on its relationship with those customers. Without access to certain information, such as the costs of supplies and the prices charged

to customers, one would be unable to profit from the knowledge of the cheesemaking process. As discussed above, that information was unavailable to employees other than Federico. Therefore, we conclude that the trial court was justified in finding that, by keeping secret from those employees its confidential business related information, Elm City made efforts that were reasonable under the circumstances to maintain the secrecy of its trade secret.

Having noted that most of Elm City's employees did not have knowledge of the confidential financial aspects of Elm City's business necessary to compete with Elm City, we also note that Federico, by contrast, did have such knowledge. As the trial court stated, Federico had learned "all the information as regards customers, pricing, suppliers, costs and everything intended to be held confidential . . . ." In his role as Weinstein's confidant and, more importantly, in his capacity as the Weinsteins' and Elm City's accountant, Federico had access to the company's business records. According to Federico's own testimony, he prepared balance sheets, income statements, statements of cash flow, monthly reports and year-end statements. He also testified that he had access to information regarding the prices Elm City charged for its goods sold, the cost of its materials, the prices it paid for the returned milk it purchased, and from whom Elm City purchased its supplies, as well as Elm City's overhead costs, administrative costs, advertising costs, promotional costs and operational costs for a thirteen or fourteen year period. In fact, Federico testified that, by the time he resigned from Elm City, he knew every financial aspect of Elm City's business. Weinstein testified that not only did Federico have access to "every financial piece of information that was at [Elm City]," but he also "had possession of voluminous records at his own office that belonged to Elm City . . . ."

In light of the fact that Federico knew every aspect of Elm City's business and would, therefore, possess the knowledge necessary to compete with Elm City if he so chose, one question remains. The question is whether, to be entitled to rely upon the protection of the trade secrets act, Elm City was required to take affirmative steps to protect the secrecy of its information with respect to Federico.

The defendants argue that Elm City's failure to require Federico to sign a confidentiality, nondisclosure or noncompetition agreement is fatal to Elm City's claims. Elm City maintains that any such agreement was unnecessary in light of the nature of Federico's relationship to both the Weinsteins and Elm City. The trial court concluded that Elm City had taken efforts to maintain the secrecy of the information constituting its trade secret that were reasonable under the circumstances. We agree.

In testifying that he had never asked Federico to sign a confidentiality agreement, Weinstein stated: "[Federico] was very sensitive to any time we talked about things of this [nature]. We had a very close relationship. It was a trusting kind of relationship. If you questioned it, he would be very upset over it. . . . I did not think it was necessary [to have Federico sign an agreement]. . . . I had trust in [him]. He was my certified public accountant."

As the trial court stated: "It is a gross oversimplification of the facts merely to state that [Federico] was the accountant for [the Weinsteins and Elm City] . . . . He was also a close friend and confidant to [Weinstein], a business advisor, a part-time overseer of business operations, [and] the 'heir apparent' and intended future leader of the company . . . ."

According to the trial court, and the testimony of Conrad Kappel, who is an expert in ethical standards

for accountants and who conducts peer reviews of accounting firms, Federico violated both General Statutes § 20-281j, which provides in relevant part that an accountant "shall not voluntarily disclose information communicated to him by the client relating to and in connection with services rendered to the client by the [accountant] in the practice of public accountancy" and the professional standards of the American Institute of Certified Public Accountants, particularly § 301, which provides in part that certified public accountants "shall not use to their own advantage or disclose any member's client confidential information. . . ." Therefore, based in part upon expert testimony, the trial court found that Federico had violated both state statute and his profession's ethical code.[26]

We conclude that, in light of the close personal relationship enjoyed over the years by the Weinsteins and Federico, it was reasonable for Elm City to assume that it had nothing to fear from Federico in the way of misappropriation of its cheesemaking process or its business information and, therefore, Elm City's decision not to take affirmative steps to ensure the secrecy of its information with respect to Federico constituted "reasonable efforts under the circumstances." Moreover, we conclude that, in light of the confidential

[26] At trial, the defendants argued that Federico was employed in "industry" and not in the practice of public accounting. The trial court noted that, according to Kappel's testimony, because Federico was performing the services of a certified public accountant, even when employed by Elm City, he was subject to the ethical standards of those in that profession. As the trial court noted, from 1982 to 1993, Federico was engaged in a public accounting practice. From October, 1993, to December, 1994, he worked in a dual capacity, as one of Elm City's employees, and also serving the company, as well as other clients, as an accountant. He remained the president and a 98 percent shareholder of Federico and Company, a firm engaged in the practice of public accounting. Accordingly, the trial court rejected the defendants' argument that Federico was not engaged in the practice of public accounting. On the basis of the foregoing, we conclude that the trial court's rejection of the defendants' argument was proper.

nature of a certified public accountant's relationship with his or her client, Elm City was not required to obtain from Federico a written statement on the order of an agreement pertaining to confidentiality, nondisclosure or noncompetition. Rather, such an agreement was implicit in the relationship between the parties, and Elm City was entitled to rely on it.

Therefore, in consideration of the foregoing, and in light of the deferential standard of review we apply to the many factual findings of the trial court, we conclude that Elm City has satisfied the secrecy requirement contained in subdivision (2) of § 35-51 (d). We acknowledge that Elm City's efforts to maintain the secrecy of its trade secrets were not as extensive as prudence might have dictated. We reiterate, however, that "[r]easonable precautionary measures for maintaining the secrecy of the [information] were all that were required." *Allen Mfg. Co.* v. *Loika,* supra, 145 Conn. 516. We emphasize that nothing in this opinion should be read to diminish the importance of taking precautionary measures—for example, requiring employees to sign confidentiality agreements, segregating duties, restricting visitor access, or other appropriate measures—in order to satisfy the statutorily mandated secrecy requirement of § 35-51 (d) (2), nor should our conclusion be construed as encouraging proprietors to be lax in their protection of the secrecy of information they want to be considered protectable trade secrets. Rather, our conclusion is merely a reflection of the unique factual circumstances that gave rise to this case.

C

Having considered the secrecy requirement of § 35-51 (d), we next consider the second requirement of the statute, contained in subdivision (1)—namely, that the information sought to be protected "[d]erives independent economic value, actual or potential, from not being

generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use . . . ."

The defendants assert that, because the profitability of Elm City's cheesemaking process depends upon the company's access to, and use of, returned milk, it does not satisfy § 35-51 (d) (1). According to the defendants, "[Elm City's] claims about the supposed uniqueness of its production process are a smokescreen to obscure the true motive of this litigation—to keep Lomar out of the return[ed] milk market, and eliminate price competition that increased [Elm City's] costs." The defendants seem to base their entire argument with respect to § 35-51 (d) (1) on the general availability of returned milk and the fact that Elm City had no exclusive contract with its suppliers for the purchase of the milk. The defendants' argument, however, focuses on the production process as constituting Elm City's trade secret. As we have concluded previously herein, the trade secret is broader than that, encompassing confidential business information, including pricing and cost data. We must determine, therefore, whether Elm City's trade secret, as found by the trial court, satisfies § 35-51 (d) (1).

The trial court determined that "the use of return[ed] milk together with the method of production being unique does have economic advantage particularly as it is sold as a filler for just three customers now being taken away by Lomar." The court concluded "that the combination of the use of the milk and the method of production was unique, and the combination has substantial economic advantage, meant to be kept confidential, which Federico saw over the years of compiling the profits of Elm City."

As Elm City notes in its brief: "Prior to establishing Lomar, Federico's only experience in the cheese business was with Elm City. . . . [He] had no independent

source of knowledge as to the particulars of 'accommodating the special needs' of [Elm City's] three-customer market: the characteristics of the product; the way the product is manufactured; the costs involved in producing it; the prices charged; and the identities of the customers willing to purchase the product. Each particular piece of this information has value in connection with the related information; all are necessary to satisfy the specialized needs of the three customers; all contribute to the economic value of Elm City's particular business niche. The economic value of the whole cannot be separated from its constituent parts." We agree.

Federico testified that he endeavored to make the same product that Elm City was making to accommodate the special needs of the same private label packers to whom Elm City sells all of its product. He conceded that Elm City occupied a specialized niche business at the time he left the company. In fact, Federico testified that, as part of his efforts to secure a bank loan to establish Lomar, he submitted to Lafayette American Bank a business plan in which he stated that " '[t]his specialized [niche] business can accommodate the special needs of the private label packers.' " In that same business plan, Federico suggested that Lomar's marketing plan had an advantage in that large manufacturers of cheese are unable to fill the special needs of the private label packers.[27]

---

[27] Federico's testimony on this point is telling, particularly in light of the fact that the "independent economic value" requirement contained in § 1 (4) (i) of the federal Uniform Trade Secrets Act; see 1 R. Milgrim, supra, § 1.01 [2], p. 1-29; which is identical to the analogous language in § 35-51 (d) (1), has been interpreted as a codification of the common-law requirement that a trade secret must give its owner a competitive advantage. See Restatement (Third), Unfair Competition, Appropriation of Trade Values § 39, p. 445, reporters' note (1995), citing *Electro-Craft Corp.* v. *Controlled Motion, Inc.*, 332 N.W.2d 890, 900 (Minn. 1983); see also *ISC-Bunker Ramo Corp.* v. *Altech, Inc.*, 765 F. Sup. 1310, 1333 (N.D. Ill. 1990) (even slight competitive edge satisfies "economic value" requirement); accord *Telerate Systems, Inc.* v. *Caro*, 689 F. Sup. 221, 232 (S.D.N.Y. 1988) (same). Because Lomar's plan, which Federico testified gave the company a competitive

Federico's own testimony demonstrates, therefore, that: Elm City occupied a special niche in the cheesemaking industry; Federico intended to duplicate Elm City's product, using Elm City's supply sources and its customers; and Lomar's business plan, which essentially mirrored that of Elm City, gave Lomar an economic advantage over large cheesemakers. Indeed, the mere fact that Elm City's plan served as the basis of Lomar's plan for the purposes of securing loans to start Lomar supports the proposition that Elm City's plan has substantial economic value.

Moreover, prior to Lomar's entrance into the market, Elm City alone occupied its special place in the local cheesemaking industry. According to Federico, Lomar sells 90 to 95 percent of its product to the same three customers to which Elm City sells virtually all of its product.[28] It is reasonable to conclude that, if Elm City's customers purchase from Lomar the same product that Elm City sells to those customers, the customers would likely buy less product from Elm City. The foregoing demonstrates plainly that Elm City's trade secret derived independent economic value from not being generally known to those who could profit from the knowledge of it, that is, in particular, the defendants.

advantage, mirrors Elm City's plan, it is manifest that Elm City's plan likewise had a competitive advantage, particularly before Lomar duplicated it for its own use. Under the reasoning of the cases cited in this footnote, therefore, Elm City's plan meets the independent economic value requirement of § 35-51 (d) (1).

[28] Moreover, Weinstein testified that, because of Lomar's purchase of returned milk from the same suppliers used by Elm City, Elm City's supply of the milk has decreased dramatically. Weinstein testified further that he received a telephone call from one of Elm City's main suppliers who stated that Elm City's supply of returned milk would be reduced significantly because the bulk of the milk would be going to a new business in Providence, Rhode Island, which is where Lomar is located. According to Weinstein, without adequate access to this crucial ingredient, Elm City would be unable to produce enough of its product to meet its customers' needs.

Therefore, on the basis of the evidence presented and the testimony elicited at trial, particularly that of Federico, we can conceive of no principled reason to disturb the trial court's finding that Elm City's business plan satisfies § 35-51 (d) (1). Having concluded that Elm City's trade secret meets all the requirements of § 35-51 (d), we affirm the trial court's judgment with respect to that court's finding of a trade secret violation.[29]

### III

We now consider whether the trial court properly awarded Elm City punitive damages and attorney's fees. We conclude that the trial court's awards were proper.

Before addressing the parties' arguments, we note that "[t]he trial court has broad discretion in determining whether damages are appropriate. *Buckman* v. *People Express, Inc.*, 205 Conn. 166, 175, 530 A.2d 596 (1987). Its decision will not be disturbed on appeal absent a clear abuse of discretion. Id." *Robert S. Weiss & Associates, Inc.* v. *Wiederlight*, supra, 208 Conn. 541.

Section 35-53 (b) provides in relevant part that, "if the court finds wilful and malicious misappropriation, the court may award punitive damages . . . and may award reasonable attorney's fees to the prevailing party."[30] The trial court expressly found "that the defendants wilfully and maliciously caused the misappropriation of Elm City trade secrets and pursuant to § 35-53

---

[29] As noted previously, we need not address the two alternate grounds for affirmance advanced by Elm City based upon CUTPA violations and breach of fiduciary duty, respectively. Likewise, we need not consider the defendants' argument that these alternate grounds provide an insufficient basis upon which to affirm the judgment of the trial court, in light of the trial court's finding that the trade secrets act provides the exclusive remedy for the conduct at issue.

[30] General Statutes § 35-53 provides in its entirety: "Damages. Punitive damages for wilful and malicious misappropriation. (a) In addition to or in lieu of injunctive relief, a complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

(b) award[ed] the sum of $300,000" in punitive damages. In a subsequent memorandum of decision, the trial court awarded attorney's fees in the amount of $100,000.[31]

The defendants assert that "[t]he paucity of evidence that [Elm City] treated its manufacturing process as secret and proprietary over the years precludes a finding of wilful and malicious infringement." We disagree.

We note first that, again, contrary to what we have concluded previously, the defendants narrowly define the trade secret at issue to Elm City's cheesemaking process. Considering Elm City's business plan as a whole, however, it is evident that Elm City took precautions to protect the secrecy of the crucial business related information from all employees except Federico, and that it reasonably believed it did not need to take affirmative steps to protect itself against Federico because he was under an obligation, as Elm City's certified public accountant, to keep such information confidential. The defendants' argument, therefore, lacks merit.

The defendants also argue that "[t]he trial record cannot support a finding that [Federico] wilfully or maliciously [mis]appropriated information from Elm City that he had reason to believe was a trade secret." The defendants claim that "the evidence suggests the words

"(b) In any action brought pursuant to subsection (a) of this section, if the court finds wilful and malicious misappropriation, the court may award punitive damages in an amount not exceeding twice any award made under subsection (a) and may award reasonable attorney's fees to the prevailing party."

[31] Although § 35-53 (b) allows trial courts to award attorney's fees for wilful and malicious misappropriation, the trial court in the present case awarded attorney's fees pursuant to General Statutes § 35-54, which provides: "Attorney's fees. If a claim of misappropriation is made in bad faith or a motion to terminate an injunction is made or resisted in bad faith, the court may award reasonable attorney's fees to the prevailing party." The court's choice of statutes does not impact our analysis of this issue.

'trade secret' were never uttered at Elm City until Lomar opened as a competing business."

The defendants' argument, relying as it does on its belief that Elm City's trade secret is limited to its manufacturing process, is, essentially, as follows. Because Federico did not know that the process was a trade secret, he could not have acted wilfully or maliciously in duplicating the process. This argument is unavailing.

We previously have noted that Federico used confidential business information that he was duty bound, by both statute and the ethics of his profession, to keep confidential. He cannot do so and then hide behind professed ignorance that the information he used improperly is part of Elm City's trade secret.

According to § 35-51 (b), one of the definitions of "misappropriation" is: "(2) disclosure or use of a trade secret of another without express or implied consent by a person who . . . (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . ." We conclude that Federico should have known that he was using information that was a trade secret and that he was duty bound to keep confidential. We further conclude that the trial court's finding of a wilful and malicious misappropriation was amply supported by the record.

The trial court found that Federico was "on a course for Elm City's demise rather than to enter into fair competition." The court noted that the defendants' choice of location for Lomar, in Providence, Rhode Island, a location closer to the milk suppliers than Elm City's location, would have the effect of "choking off Elm City's supply of return[ed] milk." Also, the court found that Federico "would be tapping the resources of Elm City's suppliers of return[ed] milk and choking

off further the distribution of Elm City's life lines by getting the three major customers of Elm City's product . . . ."

Moreover, although there was disagreement as to its cause, there was ample testimony regarding the animosity between Federico and Weinstein at the time Federico tendered his resignation.[32] A review of the facts found by the trial court, as well as a review of the testimony of both Weinstein and Federico, compels us to conclude that the trial court's finding of wilful and malicious animus on Federico's part is amply supported by the record.[33] Accordingly, we find no abuse of discretion in the trial court's awards of punitive damages and attorney's fees, and we therefore affirm the awards.

[32] Our review of the trial transcripts reveals lengthy testimony regarding the circumstances surrounding Federico's resignation. Although the trial court did not make detailed findings with respect to his resignation, Federico's own testimony, which supports the trial court's finding of wilful and malicious intent, included the following information. After decades of friendship with the Weinsteins, and approximately twelve years of professional association with Elm City and the Weinsteins, Federico resigned without warning, giving the Weinsteins no advance notice, and without making any provision for a replacement to assume his accounting duties. In fact, only days before, Federico had expressly assured Weinstein that he would remain with Elm City, despite their then recent disagreements. Within two business days of receiving a check reflecting gross pay of $227,133.29, Federico resigned as vice president of Elm City, as Elm City's accountant and as the Weinsteins' personal accountant. Federico handed his letters of resignation to Weinstein on the day that the Weinsteins were leaving on a vacation. The foregoing demonstrates the ill will Federico felt toward Weinstein and bolsters the trial court's finding that Federico acted wilfully and maliciously.

[33] Citing *Triangle Sheet Metal Works, Inc.* v. *Silver*, supra, 154 Conn. 116, the defendants opine that this court has reversed an award of punitive damages on facts more compelling than those of the present case. In that case, the trial court had awarded punitive damages when one of the defendants had breached a written confidentiality/trade secret agreement. This court affirmed the finding of a trade secret violation; id., 126; but reversed with respect to the punitive damages award. Id., 128. We note, however, that whether the facts in that case are more compelling than those in the present one is not as clear as the defendants assert. The record in the present case paints a compelling picture of an abuse of trust that the trial court reasonably could have found to be the result of improper motives, indicating wilful and malicious animus.

## IV

We turn now to the final issue raised on appeal. The defendants claim that the injunction fashioned by the trial court should be vacated on the grounds that it is not narrowly tailored to protect Elm City's trade secret, and it does not adequately inform the defendants as to the restrictions on their conduct. We disagree.

As an initial matter, we note that a trial court is vested with broad authority to fashion equitable relief. See, e.g., *Pamela B.* v. *Ment*, 244 Conn. 296, 315, 709 A.2d 1089 (1998). In the present case, on December 5, 1997, the trial court rendered a judgment that, inter alia, enjoined the defendants "for a period of three years from disclosing, using or selling any of Elm City Cheeses, confidential customer information, trade secrets, procedures, technical data or know-how relating to the products, processes, methods, research and development plans, equipment or business operations of [Elm City]." The trial court also stated: "The defendants . . . are also enjoined for a period of three years from developing or utilizing any information as to the [procedure for making] the Italian Style Grated Cheese produced by Elm City. Federico is enjoined from using any records he used or prepared for Elm City while he was acting as Elm City's accountant. The defendants are enjoined for a period of three years, including any persons or entities under their control, direction or in concert from developing or utilizing any information regarding the drying and odor control processes and

Moreover, given the highly fact-specific nature of this inquiry, in light of the deference we are obligated to give to the trial court's finding, we believe that this court's reversal of an award of punitive damages, under the specific facts of *Triangle Sheet Metal Works, Inc.*, is not controlling in the trial court's or this court's determination of whether, *under the specific facts of this case*, the trial court's award of punitive damages was a clear abuse of discretion. In other words, the fact that this court reversed on the damages issue in *Triangle Sheet Metal Works, Inc.*, does not necessarily dictate that we must do so in the present case.

equipment used in Elm City's manufacturing process. The defendants are enjoined from contracting or divulging the identity of Elm City's customers, and the defendants are enjoined directly or indirectly from selling any cheese product made like Elm City for a period of three years. The foregoing injunction does not foreclose the defendants from manufacturing or selling other types of cheese to others or the named three customers."

The defendants assert that this injunction is overly broad and unsupported by the evidence. They note that "[Elm City] alleged that its entire method of doing business constitutes a trade secret, and the trial court's order does not parse the various elements of [Elm City's] business to determine which are entitled to trade secret protection." As we have stated numerous times in this opinion, however, Elm City's method of doing business—that is, the business plan—*is* its trade secret. Therefore, there was no need for the trial court to determine which aspects of the plan are protected under the trade secrets act, because each component, as part of the trade secret, is entitled to protection.

The defendants claim that the injunction is impermissibly broad and, therefore, it "do[es] not give [them] fair notice of what they can and cannot do." Elm City maintains to the contrary, stating that "[t]he trial court fashioned an injunction only broad enough to [e]nsure protection of Elm City's trade secrets." A reading of the injunction reveals that what the defendants are prohibited from doing is merely what is encompassed within the trade secret. We therefore disagree with the defendants.

As Elm City notes, "[t]here should be no difficulty in understanding the injunction or following it. Elm City's trade secrets have value only in relation to its very limited market. The defendants are precluded from

doing business in that market. For a period of three years, the defendants cannot make a parmesan-style cheese specially manufactured for sale to private label packers who purchase the product for blending in a grated cheese product. The more particular aspects of the trade secret protection—the manufacturing processes and procedures, pricing, market and customer information—only have relevance in this very narrow market niche." We agree with Elm City's reading of the trial court's injunction.

The injunction makes clear that the defendants are prohibited from using Elm City's cheesemaking procedure, including the quick drying method Federico learned from Elm City, to manufacture cheese. They also may not use Elm City's confidential business information. As the injunction makes equally clear, the defendants are *not* prohibited, however, from making other kinds of cheeses, using other cheesemaking processes. They may even sell such products to Elm City's customers, provided the product is not a competitive substitute for Elm City's product.[34] As Elm City correctly notes, "[i]f the defendants choose to make a truly different cheese product, the trade secrets Federico learned at Elm City will have no value to him because everything from the production process to the market for the product will be sufficiently different as to avoid any possible misinterpretation of the order." Put simply,

---

[34] The defendants argue that, even if an injunction is proper, this court should vacate the trial court's injunction and remand the matter to that court with instructions to clarify the injunction "to make clear that [the] defendants are not restricted from using customer information, or other information about [Elm City's] cheesemaking process that [Elm City] never claimed as unique or proprietary." Such a clarification is unnecessary. The injunction is clear. It properly prohibits the defendants from using customer identity only with respect to the sale of parmesan-style cheese for use as filler in those customers' products. As noted in the text of this opinion, the defendants are not prohibited from selling other kinds of cheeses to those same customers.

the injunction states plainly what actions the defendants are prohibited from taking and, even, certain actions they are *not* prohibited from taking.

In light of the foregoing, we cannot conclude that the injunction is impermissibly broad. Accordingly, we affirm the trial court's injunction order.

V

In summary, we conclude that: (1) Elm City's trade secret meets the requirements of § 35-51 (d); (2) the trial court did not abuse its discretion in awarding punitive damages and attorney's fees; and (3) the injunction fashioned by the trial court is not impermissibly broad.

The judgment is affirmed.

In this opinion BORDEN and PETERS, Js., concurred.

BERDON, J., concurring in part and dissenting in part. I agree with the majority that the cheese drying process and unique business of the named plaintiff, Elm City Cheese Company, Inc. (Elm City), constitutes covered "information, including a . . . method . . . [or] process"[1] under the Uniform Trade Secrets Act (trade secrets act), General Statutes § 35-50 et seq.

The trial court reasonably concluded that "Elm City had a unique way to produce its cheese product and the combination of factors that produce its cheese is a trade secret." As this court stated in *Allen Mfg. Co.* v. *Loika*, 145 Conn. 509, 515, 144 A.2d 306 (1958), and the majority in this case recognizes, Elm City's use of return milk, its supplier and customer lists, and the unique process used to quickly dry the cheese product, catering to a niche market, gave it the "ability to combine these elements into a successful . . . process, like

---

[1] General Statutes § 35-51 (d). See footnote 8 of the majority opinion for the full text of § 35-51.

the creation of a recipe from common cooking ingredients, [and] is a trade secret entitled to protection." (Internal quotation marks omitted.) This, however, is only the first statutory requirement necessary to qualify as a trade secret. The trade secrets act also requires that the information upon which a claim is made must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." General Statutes § 35-51 (d) (2). There is not a scintilla of evidence to support that essential requirement.

Elm City failed to take very basic, common measures to ensure the secrecy of its business methods and practices. The plaintiff Richard Weinstein,[2] co-owner and president of Elm City, testified that he neither required the named defendant, Mark Federico—or any other employee—to sign a confidentiality agreement or covenant not to compete, nor did Elm City's employee manual make any reference to the confidential nature of the business. Elm City also failed to take any precautions to shield the production process from visitors to the plant. Finally, Elm City did not use unnamed or coded ingredients. Similar failures to preserve secrecy have resulted in courts declining to extend trade secret protection. See, e.g., *Pressure Science, Inc.* v. *Kramer*, 413 F. Sup. 618, 626–28 (D. Conn. 1976); *Wilson Certified Foods, Inc.* v. *Fairbury Food Products, Inc.*, 370 F. Sup. 1081, 1085–86 (D. Neb. 1974).

What is frightening about the majority opinion is that this case will make it virtually impossible for an employee to leave his employment and establish a competing business in situations where the employer never considered that its process was a trade secret even though the employee is not bound by a contractual obligation not to compete.

---

[2] While Weinstein originally was a plaintiff in this action, his claims were dismissed by the trial court. See footnote 2 of the majority opinion. We therefore refer to Elm City as the plaintiff.

Although, in my view, the trade secrets claim must fail, Elm City is not left without legal redress for Federico's deplorable conduct. Federico had a "special relationship of confidence or trust" with Weinstein and Elm City. *Holiday Food Co.* v. *Munroe*, 37 Conn. Sup. 546, 553, 426 A.2d 814 (1981).

Indeed, it is apparent to me that the main thrust of Elm City's case was its first count for breach of a fiduciary obligation and its third count for violations of the Connecticut Unfair Trade Practices Act (CUTPA),[3] General Statutes § 42-110a et seq. As the trial court found, "[a]lthough Federico may have learned some aspects of Elm City's methods of production . . . while an employee, all the important, intricate components of Elm City's business became fully known to Federico when he served as a [certified public accountant] for Elm City and [its owners]."

Whether in his capacity as a certified public accountant or in the broader confidant capacity that Federico served in as vice president and heir apparent at Elm City, as the trial court found, a fiduciary relationship obviously existed and Federico breached the duty of loyalty to the plaintiffs. "Rather than attempt to define a fiduciary relationship in precise detail and in such a manner to exclude new situations, we have instead chosen to leave the bars down for situations in which there is a justifiable trust confided on one side and a resulting . . . influence on the other." (Internal quotation marks omitted.) *Dunham* v. *Dunham*, 204 Conn. 303, 320, 528 A.2d 1123 (1987), quoting *Harper* v. *Adametz*, 142 Conn. 218, 225, 113 A.2d 136 (1955).

---

[3] The trial court found that Federico's conduct constituted "unfair competition" in violation of CUTPA. The trial court stated that, "it is incomprehensible that a licensed [certified public accountant] would violate professional and statutory ethical standards and open a business in direct competition with a former client armed with only the knowledge that he gained from that former client."

The trial court did not assess damages for the breach of fiduciary duty or the CUTPA violations because the court found that any traditional tort claim or civil remedy was preempted by the trade secrets act, and was excluded from the damages calculation under that act's statutory scheme.[4] I would reverse the trial court's judgment with respect to the trade secrets act claim and order a new trial on the issue of damages for the breach of fiduciary duty and the CUTPA violations.

Accordingly, I dissent.

MCDONALD, J., concurring in part and dissenting in part. I disagree with the majority's conclusion upholding the trial court's finding that the plaintiff, Elm City Cheese Company, Inc. (Elm City), was entitled to trade secret protection. The majority relies on the following factors to entitle Elm City to trade secret protection for its cheesemaking operation "as a whole": (1) its purchase of returned milk from a number of dairies; (2) its production from that milk of hard grated cheese filler through a unique process; and (3) its sale of that filler to only three cheesemakers to blend into their cheeses.[1]

To qualify as a trade secret under General Statutes § 35-51 (d), the information in question must be "secret" and "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." "[E]mployee access to trade secrets is not inconsistent with . . . secrecy. But employees having such access should be

---

[4] General Statutes § 35-57 (a) provides: "Unless otherwise agreed by the parties, the provisions of this chapter supersede any conflicting tort, restitutionary, or other law of this state pertaining to civil liability for misappropriation of a trade secret."

[1] I would conclude that whether the named defendant, Mark Federico, learned any of this information in his capacity as Elm City's accountant is relevant only in considering a claim of breach of fiduciary duty and is of no consequence in determining if a trade secret exists.

carefully cautioned as to the trade secret status of matters on which they work." 1 R. Milgrim, Trade Secrets (1999) § 1.04, pp. 1-190 through 1-191. "Although it is not essential that the proprietor have exclusive possession of the information, a substantial element of secrecy must exist, to the extent that there would be difficulty in acquiring the information except by the use of improper means." (Internal quotation marks omitted.) *Robert S. Weiss & Associates, Inc.* v. *Wiederlight*, 208 Conn. 525, 538, 546 A.2d 216 (1988).

Improper acquisition of trade secrets includes "theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case. Independent discovery and analysis of publicly available products or information are not improper means of acquisition." Restatement (Third), Unfair Competition, Appropriation of Trade Values § 43 (1995). "The factors used to determine whether given information is a trade secret include the extent to which the information is known outside the business and by employees and others involved in the business, the measures taken by the employer to guard the secrecy of the information, the information's value to the employer and to competitors, the resources the employer expends in developing the information, and the ease or difficulty with which the information could be properly acquired or duplicated by others." *Robert S. Weiss & Associates, Inc.* v. *Wiederlight*, supra, 208 Conn. 538. "Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *Town & Country House & Homes Service, Inc.* v. *Evans*, 150 Conn. 314, 318, 189 A.2d 390 (1963).

Under these principles, the purchase of returned milk from a number of dairies does not constitute a trade secret. It is well known that cheese is made from the

pressed curds of milk. Webster's Third New International Dictionary, p. 382. A curd is produced when part of the milk is treated with rennet and sometimes fermented. P. Montagné, The New Larousse Gastronomique (1977) p. 208. "From the earliest times cheese has been made in stock-rearing countries to use up surplus milk." Id., p. 207. Elm City is hardly entitled to trade secret protection for such a practice. It would also be surprising if very young children could not identify milk wholesalers and dairies as suppliers of milk. That stale milk, no longer having retail value, would be cheaper to purchase than fresh milk is also common knowledge. Moreover, there was no evidence before the trial court that Elm City did anything to safeguard the business practice of purchasing returned milk with which to make cheese. Elm City, in fact, had no restrictive agreement with any employee about anything.[2] Thus, the purchase of returned milk from a number of dairies does not qualify as a trade secret.

With regard to the method of production of exclusively hard grated cheese filler, there was evidence that the techniques used to produce the cheese without creating a noxious odor and the use of air conditioning to speed the fermentation process may not be known commonly. Elm City, however, did nothing to keep its contractor's inventions a secret, if indeed it could have done so in the absence of an agreement with the inventor. Furthermore, the inventor described the system at length at a public hearing before the department of environmental protection, and Elm City described this system in a pleading it filed with that department. Elm City did not request that the document be filed under

---

[2] Elm City attempted to justify the lack of an agreement with other employees by arguing that the majority of its employees over the years have spoken English as a second language. There was no evidence, however, that the employees' senses were impaired or that they could not speak and understand some language. I find this excuse unpersuasive.

seal. This production method, therefore, cannot be considered a trade secret.

Finally, Elm City's sale of its product exclusively to three cheesemakers is not a trade secret. "There is no trade secret . . . if [information] can readily be ascertained through ordinary business channels or reference resources." *Robert S. Weiss Associates, Inc.* v. *Wiederlight*, supra, 208 Conn. 538. "[W]here the identity of the customers is readily ascertainable through ordinary business channels or through classified business or trade directories, the courts refuse to accord to the list the protection of a trade secret." *Town & Country House & Homes Service, Inc.* v. *Evans*, supra, 150 Conn. 320. The identity of those who sell cheese containing the filler produced by Elm City could be ascertained easily through a visit to the grocer or the Italian deli. Here again, Elm City did nothing to protect the "secrecy" of the identity of its customers.

Because none of the three factors relied upon by the majority constitutes a trade secret alone or in combination, the information taken "as a whole" or in an "overall way" does not merit trade secret protection. As the majority admits, it is "not saying, however, that each and every component is necessarily a trade secret in and of itself . . . ." The character of some nonsecret information does not change simply because it may be presented together with other nonsecret information. It is impossible to add three zeros and reach a sum greater than zero. See J. King, The Art of Mathematics (1992) p. 63. There could be no evidence that buying returned milk to make cheese, combined with selling cheese fillers to cheese manufacturers would be a trade secret. The "trade secret" protected by the majority is a true example of what Robert Milgrim, in his leading text, describes as "protection of the business rather than [of] 'secrets' " where the "secret" information is

"all-embracing with reference to any given enterprise . . . ." 1 R. Milgrim, supra, § 1.09 (8) (d), p. 1-470.

After concluding that Elm City is entitled to trade secret protection, the trial court enjoined the defendants Mark Federico and Lomar Foods, Inc., for a period of *three years* from, among other things, (1) developing or utilizing any information as to the manufacturing process and drying and odor control processes and equipment for the cheese produced by Elm City, (2) contracting with or divulging the identity of Elm City's customers and (3) directly or indirectly selling any cheese product made like Elm City's.[3] In a trade secret case, the injunction should not be for a limited period of time unless the court finds that, in that time, the trade secrets would cease to exist. The remedy prescribed by Connecticut's Uniform Trade Secrets Act provides: "Actual or threatened misappropriation may be enjoined upon application to any court of competent jurisdiction. An injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." General Statutes § 35-52 (a). The three year limit on the injunction suggests that there are no trade secrets to be protected.

In sum, there can be no trade secrets in Elm City's production methods or lists of suppliers and customers. Any other conclusion, as Justice Berdon points out, would turn employment with any industry into a universal contract not to compete and would completely restrict the rights of a former employee to use knowledge legitimately gained during employment. American

---

[3] The only injunction that the trial court issued without the time limit was a prohibition on using any records Federico used or prepared for Elm City while he was acting as its accountant.

law, up to date, recognizes no such wide-sweeping view of trade secrets for those activities. Trade secret law should not only encourage innovation but also maintain " 'the public interest in having free and open competition in the manufacture and sale of unpatented goods.' " *Pepsico, Inc.* v. *Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995), quoting 2 M. Jager, Trade Secrets Law (Rev. Ed. 1994) § IL.03. "Upon termination of the agency [relationship] . . . and in the absence of a restrictive agreement, the agent can properly compete with his principal in matters for which he had been employed. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete." (Internal quotation marks omitted.) *Town & Country House & Homes Service, Inc.* v. *Evans*, supra, 150 Conn. 317. "An employee has a right to grow with his experience, and he can carry away for general use his skill and everything that he has learned at his place of employment, except trade secrets." A.B.A., Trade Secrets: A State-by-State Survey (A. Pedowitz & R. Sikkel eds., 1997) p. 147; see 2 Restatement (Second), Agency § 396, comments (b) and (h) (1958). Because Elm City's production methods and customer lists were not trade secrets, Federico was entitled to use them in his new business to compete with his former employer.

I fully agree with the opinions of the majority and Justice Berdon, however, as to the trial court's well reasoned and sound conclusion that Federico violated his fiduciary duty as an accountant with respect to Elm City. The trial court did not award damages for the accountant-client confidentiality breach because the court found Elm City's exclusive remedy to be under the Uniform Trade Secrets Act. The trial court thereby did not distinguish between the information Federico learned as Elm City's accountant and that which he learned in his role as the operations manager. In these

circumstances, fairness requires a new trial on the issues of liability and damages for the breach of accountant-client confidentiality. See *Fazio* v. *Brown*, 209 Conn. 450, 455, 551 A.2d 1227 (1988).

Accordingly, I dissent.