[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs have applied to this court for a temporary injunction enjoining the defendant James L. Hard, a former employee, and the defendant Precision Sights International, LLC ("PSI"), Hard's company, from engaging in competitive business activities or utilizing and disclosing information the plaintiffs' deem to be trade secrets. The plaintiff Mec-Gar, S.R.L. is a corporation organized under the laws of the Republic of Italy with its principal place of business in that country. It is a manufacturer of firearm magazines[1] for rifles and pistols. The plaintiff Mec-Gar U.S.A., Inc. is a Connecticut corporation which acts as the representative for Mec-Gar, S.R.L. in the United States and serves as the resale distributor for Mec-Gar products.
The defendant James L. Hard was previously the Vice President and General Manager of Mec-Gar U.S.A., Inc. He resigned from the employ of Mec-Gar U.S.A., Inc. on January 31, 2001. The defendant Precision Sights International, LLC ("PSI") was established by Hard in June 2000 and he is the sole owner and principal of PSI. The plaintiffs claim that Hard through PSI engaged in competitive business activities that violated his fiduciary obligations to the plaintiffs and that he is privy to trade secrets of the plaintiffs which could be used by him to their detriment. The plaintiffs seek a temporary injunction under the common law and under the Uniform Trade Secrets Act, General Statutes § 35-50, et seq, enjoining the defendants from utilizing any trade secrets of the plaintiffs or engaging in certain specified competitive activities.[2]
Based on the evidence presented at the hearing on the plaintiffs' application for a temporary injunction, I find the following facts. James L. Hard was hired by Mec-Gar U.S.A., Inc. in July 1995 as its Vice President and General Manager. As such, he was responsible for the management of the operation of the business in the United States and for promoting the sale of Mec-Gar S.R.L. products in the United States. He continued in that role on a full-time basis until July 1997 when his employment became part-time. Although Hard's status changed from CT Page 12524 full-time to part-time, his title, position and responsibilities remained the same. Hard had no written employment agreement with the plaintiffs. He also never entered into a non-competition agreement nor did he sign any confidentiality agreement with the plaintiffs.
In June 2000, while still employed by Mec-Gar U.S.A., Inc., Hard established Precision Sights International, LLC ("PSI") of which he is the sole owner. Hard did not inform anyone at Mec-Gar U.S.A., Inc. or Mec-Gar S.R.L. of the formation of the company or his involvement with it.
In July 2000, PSI purchased from Mec-Gar U.S.A., Inc. approximately 4,500 magazines of various types manufactured by Mec-Gar S.R.L. for which PSI paid $24,366. No one at Mec-Gar U.S.A. or Mec-Gar S.R.L. was aware of Hard's association with PSI. In fact, Hard took steps to conceal his affiliation. Hard intentionally did not use his usual signature on the check sent by PSI to Mec-Gar U.S.A., Inc. and he made his signature illegible.
On subsequent occasions in 2001, PSI did business with Mec-Gar U.S.A., Inc., purchasing magazines and sights. On each occasion, Hard failed to disclose to either Mec-Gar U.S.A., Inc. or Mec-Gar S.R.L. that PSI was his alter ego. PSI subsequently resold for a profit the items it purchased from Mec-Gar U.S.A., Inc.
From PSI's inception in June 2000 until his resignation from Mec-Gar U.S.A., Inc. on January 31, 2002, Hard continued to deceive the plaintiffs concerning his relationship with PSI. For example, in an e-mail to Mec-Gar SRL dated May 10, 2001 Hard stated that PSI would be at a particular trade show and that he would speak to them about specific products. He purposefully sought to conceal the fact that he was PSI.
In the spring of 2001, Mec-Gar U.S.A., Inc. received notice from LPA, a manufacturer of gun sights, that LPA was terminating its resale distribution contract with Mec-Gar U.S.A., Inc. effective December 31, 2001. LPA terminated the relationship because the sale of LPA sights by Mec-Gar U.S.A., Inc. had fallen substantially over the years. Shortly thereafter, Hard on behalf of PSI entered into an arrangement with LPA for PSI to replace Mec-Gar U.S.A., Inc as the resale distributor of sights manufactured by LPA. At the time of Hard's negotiations with LPA, Mec-Gar U.S.A., Inc. was still the resale distributor of LPA sights.
Hard resigned from the employ of Mec-Gar U.S.A., Inc. on January 31, 2002. Prior to resigning, Hard entered into agreements with three companies, Act-Mag, Checkmate Industries, and Novaks, Inc. for PSI to act CT Page 12525 as a resale distributor of their products. Act-Mag and Checkmate Industries manufacture gun magazines and are direct competitors of Mec-Gar SRL and Mec-Gar U.S.A., Inc. Novaks Inc. sells in its own name magazines manufactured by Act-Mag.
In early January 2002, Hard met with representatives of Smith Wesson, a gun manufacturer and customer of magazines manufactured by Mec-Gar SRL. At that meeting, Hard promoted magazines manufactured by Checkmate Industries.
Prior to leaving the employ of Mec-Gar U.S.A., Inc., Hard drafted and submitted a directory listing for PSI for the 2002 Shot Show, a trade show and conference which was to be held February 2-5, 2002 in Las Vegas Nevada. The directory listing identified PSI as a resale distributor for Act-Mag and Checkmate magazines and Novaks products. Hard also submitted prior to his resignation an advertisement in American Handgunner Magazine for publication after January 31, 20002. The ad featured PSI as the distributor of products for Act-Mag, Checkmate Industries, Novaks Inc. and LPA.
Mec-Gar SRL and Mec-Gar U.S.A., Inc. had been expecting Hard to attend the 2002 Shot Show as their representative. He was listed as their representative in their directory listing and they paid for Hard's transportation and lodging to attend the show. Although Hard had been planning for months to submit his resignation, he did not do so until two days before the commencement of the Shot Show.
 I Breach of Fiduciary Duty
The plaintiffs first assert that Hard violated his fiduciary duty to Mec-Gar U.S.A., Inc. by engaging in secret self-dealing transactions with the plaintiffs and by diverting to his own benefit business opportunities of the plaintiffs. The defendants maintain that Hard owed no fiduciary duty to the plaintiffs and that none of his actions were in violation of any such duty. The court agrees with the plaintiffs.
Hard as an employee of the Mec-Gar U.S.A. was a fiduciary during the term of his employment with respect to matters within the scope of his employment.[3] Town Country House Homes Service v. Evans,150 Conn. 314, 317 (1963). See also Taylor v. Hamden Hall School, Inc.,149 Conn. 545, 552 (1962). As an employee, he was obligated to exercise the utmost good faith, loyalty and honesty toward his employer and he was bound not to compete with his employer concerning the subject matter of CT Page 12526 his employment. Id. As an agent of Mec-Gar U.S.A., Inc., Hard was subject to a duty not to deal with his principal as an adverse party without his principal's knowledge. 2 Restatement (Second), Agency § 389 (1958).
In the absence of a restrictive agreement, such as a covenant not to compete, an employee, upon termination of employment, can properly compete with his employer in matters for which he had been employed. Town Country House Homes Service v. Evans, supra, 150 Conn. 317. "Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment . . . in direct competition with the employer's business." Id., citing 2 Restatement (Second), Agency § 393, comment e.
During the term of his employment with Mec-Gar U.S.A., Inc., Hard failed to honor his fiduciary obligations to his employer. Through PSI, he secretly entered into numerous transactions with Mec-Gar U.S.A., Inc. thereby violating his duty not to deal with his principal as an adverse party without his principal's knowledge. An employee may not, without his employer's knowledge, sell the employer's products to himself. 2 Restatement (Second), Agency § 389 (1958). This principle holds even in cases where there is no harm to the principal. 2 Restatement (Second), Agency § 389 (1958), comment c.[4] Therefore, the defendants' claim that the plaintiffs benefitted from the sale of sights and magazines to PSI because the products consisted of dormant and unsaleable inventory is unavailing. It is also unavailing because PSI subsequently resold the sights and magazines for a profit. That opportunity to sell the items for a higher price should have been provided to Hard's employer, not usurped by him.
Hard also violated his fiduciary duties to Mec-Gar U.S.A., Inc. by establishing PSI and using it to compete for business held by his employer. Town Country House Homes Service v. Evans, supra,150 Conn. 317. "Unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency." 2 Restatement (Second), Agency § 393 (1958). While employed by Mec-Gar U.S.A., Inc., Hard on behalf of PSI entered into an arrangement with LPA for PSI to replace Mec-Gar U.S.A., Inc as the resale distributor of sights manufactured by LPA. Hard through PSI was competing with his employer for LPA's business. The fact that LPA had notified Mec-Gar U.S.A., Inc. that it was terminating its contract with Mec-Gar U.S.A., Inc. was immaterial since Mec-Gar U.S.A., Inc. was interested in retaining LPA's business. Hard was also competing against his employer by seeking to sell LPA sights at a time when Mec-Gar U.S.A. was trying to CT Page 12527 sell its unsold inventory of LPA sights.
Hard in dealing with LPA through PSI was also improperly acting with conflicting interests in derogation of his duty to serve his employer. "Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." 2 Restatement (Second), Agency, § 387 (1958). It was a conflict of interest for Hard to pursue LPA's business while his employer was concerned with the loss of that business. Hard desired LPA's business for himself at a time when his employment with Mec-Gar U.S.A., Inc. mandated that he work to mend LPA's relationship with his employer. He chose to serve his self interest by contracting with LPA to replace Mec-Gar U.S.A. as the resale distributor of LPA gun sights.
The plaintiffs also complain of other activities undertaken by Hard during his employment which they claim violate his fiduciary responsibilities to his employer. They assert that Hard took action to compete with Mec-Gar U.S.A. by drafting and submitting for publication in the directories for the 2002 Shot Show and the 2002 IWA trade show material for PSI that promoted competitors of Mec-Gar U.S.A, Inc.; by receiving samples of Act-Mag and Checkmate Industries products for display at the PSI booth at the Shot Show; by drafting and submitting an advertisement for PSI for American Handgunner Magazine; and by reaching verbal agreements with Act-Mag, Checkmate Industries and Novaks Inc. for PSI to act as the distributor of their products. The defendants maintain that these actions were proper because they constituted preparation for Hard to compete with Mec-Gar U.S.A. once his employment ended.
An agent, while still an agent, may properly make arrangements to compete with his principal upon termination of the agency. 2 Restatement (Second), Agency § 393 (1958), comment e. The court agrees with the defendants that Hard's preparation of directory listings and advertisements that were not published until after the termination of his employment were mere preparations to compete with Mec-Gar U.S.A, Inc. Similarly, the actions of Hard in entering into agreements with competitors of Mec-Gar U.S.A, Inc. to sell their products after termination of his employment constitute permissible steps toward competition, not acts of competition themselves.
In one instance, however, Hard went beyond simply laying the groundwork to compete with his employer in the sale of gun magazines and transgressed into actually competing with it. In early January 2002, prior to his departure from the employ of Mec-Gar U.S.A, Inc., Hard solicited Smith Wesson, a customer of Mec-Gar U.S.A, Inc. and a purchaser of Mec-Gar S.R.L. magazines. Hard sought to interest Smith CT Page 12528 Wesson in the purchase of magazines manufactured by Checkmate Industries, a competitor of the plaintiffs. In doing so while still employed by Mec-Gar U.S.A, Inc., Hard breached his fiduciary duty not to compete with his employer or to act for persons whose interests conflict with those of his employer concerning the subject matter of his employment. Town Country House Homes Service v. Evans, supra, 150 Conn. 317. See also 2 Restatement (Second), Agency § 393 and § 394 (1958).
Finally, the plaintiffs assert that Hard diverted a business opportunity of his employer to a competitor when Novak's Inc. chose Act-Mag, rather than Mec-Gar S.R.L., to manufacture its magazines. Additional factual background is necessary to understand this claim.
In June 2001, Novaks Inc. inquired of the plaintiffs whether Mec-Gar S.R.L. would be interested in manufacturing magazines which Novak's Inc. would then sell under its own name. Novak's Inc. asked the plaintiffs for a price quote to produce the magazines. Novak's Inc. and the plaintiffs never consummated an agreement. Novak's Inc. ultimately arranged for Act-Mag to manufacture magazines for sale with Novak's logo and PSI became a distributor of Novak's products upon the termination of Hard's employment with Mec-Gar U.S.A., Inc.
The plaintiffs assert that Hard diverted to Act-Mag their opportunity to manufacture magazines for Novak's Inc. The plaintiffs failed however to offer any evidence that Hard had anything to do with their loss of that opportunity. No evidence was presented that Hard discouraged Novak's from working with the plaintiffs or that Hard encouraged Novak's to enter into an agreement with Act-Mag. Hard also did not expropriate the opportunity to manufacture magazines for Novak's to himself. PSI is not in the business of manufacturing magazines and it does not manufacture magazines for Novak's. Without more, this court declines to infer from PSI's subsequent role as a distributor of Act-Mag and Novak's products that Hard interfered with a potential business relationship between Mec-Gar S.R.L. and Novak's Inc.
 II Violation of The Uniform Trade Secrets Act
The plaintiffs contend that Hard acquired during his employ information that constitutes trade secrets and that he will inevitably use those trade secrets as he competes through PSI with the plaintiffs in the future. They seek an injunction under the Uniform Trade Secrets Act, General Statutes § 35-52 (a), against the use of the information by CT Page 12529 the defendants. The defendants argue that such an injunction is inappropriate as none of the information which Hard gained over the course of his employment with Mec-Gar U.S.A., Inc. rises to the level of trade secrets. I concur with the defendants.
The Uniform Trade Secrets Act defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." General Statutes § 35-51 (d).
The plaintiffs claim that information which Hard was privy to concerning their business methods and their internal cost data comprise trade secrets. Regardless of whether this information meets the first prong of the trade secret test under subsection (1) of General Statutes § 35-51 (d), the information fails to satisfy the requirement of subsection (2) of the statute. The information which concerns the plaintiffs was not the subject of efforts that were reasonable under the circumstances to maintain its secrecy.
The plaintiffs argue that the details involved in the solicitation and sale of their products to particular customers who are original equipment manufacturers (OEMs) constitute business methods which are trade secrets. These details include the source and specific type of materials used by Mec-Gar S.R.L. to manufacture particular stainless steel magazines, unique aspects of its fabrication process and the particular needs of its OEM customers. The plaintiffs also claim that internal cost data relative to the prices charged Mec-Gar U.S.A., Inc. for products manufactured by Mec-Gar S.R.L. is confidential and protected as a trade secret.
The plaintiffs failed to provide any evidence that they took any significant steps to keep this information secret. The only measures taken by the plaintiffs to maintain the secrecy of the information were occasional verbal instructions to employees that information should be kept confidential. Hard was not asked at any time during his employ to sign a confidentiality agreement and no evidence was presented that any other employee signed such an agreement. No written confidentiality policy was drafted or distributed. No evidence was presented that warnings or cautionary legends were placed on any documents containing information that the plaintiffs now seek to protect from disclosure. There is no evidence before me that information now deemed by the plaintiffs to be CT Page 12530 confidential was segregated or secured in any way. See Elm City CheeseCo. v. Federico, 251 Conn. 59, 79 (1999) ("[R]easonable efforts to maintain secrecy `often include some of the following techniques: requiring employees to sign confidentiality agreements or otherwise advising them of the confidential nature of the process; posting of warning or cautionary signs, or placing legends on documents; taking precautions regarding visitors, by requiring them to sign confidentiality agreements, having them sign in, and shielding the process from their view; segregating information, so that no one person or written source discloses the entire manufacturing process; and using unnamed or coded ingredients,'" citing 1R. Milgrim, Trade Secrets (1999) § 1.04, pp. 1-178 through 1-189.)
While the aforementioned methods of insuring secrecy are not exclusive, the plaintiffs have not offered evidence of any alternative methods utilized by them to maintain the secrecy of their business methods or internal cost data. Occasional verbal instructions that information generally is confidential without anything more do not constitute reasonable efforts under the circumstances to maintain the secrecy of the specific information the plaintiffs seek to keep from disclosure.
Nor is this case similar to the situation in Elm City Cheese Co. v.Federico, supra 251 Conn. 59. In Elm City Cheese Co., the Supreme Court found the company's method of conducting business to be a trade secret because sufficient information was kept confidential to make it impossible for any employee to utilize the company's business methods to compete and the Supreme Court upheld the trial court's issuance of an injunction against Federico because he was the one employee with knowledge of the entire business operation. Here, the plaintiffs have not shown that they took any specific steps to keep portions of their business operations confidential and Hard is not knowledgeable about the entire operation of Mec-Gar S.R.L.
 III Injunctive Relief
The plaintiffs ask the court to enter an injunction that enjoins the defendants from disclosing or utilizing any information relating to the business methods or operations of the plaintiffs; soliciting sales or selling, directly or indirectly, firearm magazines and sights to any entity that was a customer of the plaintiffs s during Hard's term of employment; and performing any activities relating to the sale, promotion or distribution of LPA products. The plaintiffs request that the CT Page 12531 injunction extend through January 31, 2004.
A party seeking injunctive relief has the burden of establishing irreparable harm and the lack of an adequate remedy at law. Walton v. NewHartford, 223 Conn. 155, 165 (1992). "Where an injury is of such a nature that it cannot be adequately compensated in damages, or cannot be measured by any pecuniary standard, it is irreparable. Whether damages are to be viewed by a court of equity as `irreparable' or not depends more upon the nature of the right which is injuriously affected than upon the pecuniary measure of the loss suffered." (Quotation marks and citations omitted.) New London v. Perkins, 87 Conn. 229, 235 (1913). In its consideration of a request for an injunction, the court may consider and balance the injury complained of with that which will result from interference by an injunction. Moore v. Ganim, 233 Conn. 557, 616 n. 25 (1995). The court must properly weigh the equities between the parties and only grant that relief compatible with the equities of the case.Walton v. New Hartford, supra, 223 Conn. 167.
The Uniform Trade Secrets Act also provides that a court may enjoin "actual or threatened misappropriation" of a trade secret. General Statutes § 35-52 (a). The potential loss of a trade secret is not measurable in money damages and constitutes irreparable harm. FMC Corp.v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984). "A trade secret once lost is, of course, lost forever." Id.
The plaintiffs' request for an injunction prohibiting the use or disclosure of information related to their business methods or operations is premised on their claim that the information entails trade secrets under the Uniform Trade Secrets Act. Since that claim fails as a result of my finding that the plaintiffs have not shown reasonable efforts to maintain the information's secrecy, so too must the plaintiffs' request forbidding disclosure.
The plaintiffs have shown that Hard violated his fiduciary obligations to Mec-Gar U.S.A., Inc. The injury suffered by the plaintiffs as a result Hard's self-dealing through the purchase by PSI of sights and magazines from Mec-Gar S.R.L. is the loss of an opportunity usurped by Hard to sell those products at an increased profit. That injury is not irreparable and can be adequately compensated by the award of damages. The, measure of the plaintiffs' damages is readily ascertainable and is the reduction in price given by the plaintiffs to PSI and the profit obtained by the defendants upon resale.
Hard also violated his fiduciary duty by soliciting the customers of his employer prior to the termination of his employment with Mec-Gar CT Page 12532 U.S.A., Inc. Hard entered into an arrangement with LPA to use PSI to sell LPA manufactured products and he approached Smith Wesson about purchasing magazines of a competitor. Mec-Gar U.S.A., Inc. is entitled to an injunction restraining Hard and PSI, as his alter ego, from performing any service for LPA or Smith Wesson in competition with Mec-Gar U.S.A., Inc.. Town Country House Homes Service v. Evans, supra, 150 Conn. 318. The nature of Hard's breach of his fiduciary obligations does not warrant extending injunctive relief to any entity that was a customer of the plaintiffs during Hard's term of employment.Holiday Food Co., Inc. v. Munroe, 37 Conn. Sup. 546, 549-50 (1981).
The plaintiffs request that the term of any injunction be eighteen months. Weighing the injury to the plaintiffs with the extent of an injunction's interference with the defendants, the court determines that an injunction of one year's duration is appropriate.
Based on the foregoing, the defendants are hereby enjoined for a period of one year from the date of this order from performing any activities relating to the sale, promotion or distribution of LPA products and from soliciting sales or selling, directly or indirectly, firearm magazines and sights to Smith Wesson.
BY THE COURT
Judge Jon M. Alander