[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
RE: PLAINTIFF'S MOTION FOR TEMPORARY INJUNCTION
In conjunction with a seven count complaint,[1] the plaintiff, Wentworth Laboratories, Inc. (hereinafter, Wentworth) seeks issuance of a temporary injunction enjoining Probe 2000, Inc. (hereinafter, Probe 2000) and each of the individual defendants[2] from continuing any employment by Probe 2000 or from acting in concert of cooperation with Probe 2000 in the development and/or manufacture of vertical probe cards (hereinafter, VPC). The plaintiff further seeks to enjoin the defendants from using, publishing or otherwise disclosing any alleged proprietary or confidential information or trade secrets allegedly acquired by the defendants either through their prior employment by Wentworth or "via improper means."
The plaintiffs claim for injunctive relief rests primarily upon two points: that the defendants' conduct has violated the Connecticut Trade Secrets Act, Connecticut General Statutes §§ 35-50 et seq. and is also a violation of the confidential and noncompetition agreements signed by each defendant when the defendants were in Wentworth's employ.
The non-competition clause provides that for a period of one year after leaving Wentworth, the employee would not work for any direct competitor of Wentworth's that was within fifty miles of a Wentworth facility. The clause also contained a nonexclusive list of Wentworth's competitors. The "confidentiality and non-competition agreement" further provides, in pertinent part, that the employee shall not:
 directly or indirectly, use for himself or for another, or disclose to another, any Confidential Information . . . of Wentworth. . . . It is understood that Confidential Information does not include information that is already public knowledge, or that subsequently becomes public knowledge. . . .
CT Page 14700
The "Confidentiality, Trade Secret and Patent Assignment Agreement" provides, in pertinent part, that the employee shall not:
 disclose to anyone . . . or make use of information or knowledge relating to the Company's business, manufacturing methods, processes, techniques, products or research obtained by me while in the employ of the Company which shall not be generally known to the public or recognized as standard practices. . . .
Under Connecticut General Statutes §§ 35-50 et seq., the trade secrets act, "actual or threatened misappropriation" of trades secrets may be enjoined. See General Statutes § 35-52. (Emphasis added.)
"Trade secrets" are defined as "information including a formula, pattern, compilation, program, device, method, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." General Statutes § 35-51 (d).
The purpose of a temporary injunction is to preserve the status quo until final determination of the parties' rights has been litigated. SeeClinton v. Middlesex Mutual Assurance Co., 37 Conn. App. 269, 270
(1995). In order to succeed in a request for a temporary injunction, the moving party must prove four elements: (1) irreparable and imminent injury; (2) lack of adequate remedy at law; (3) likelihood of success on the merits; and (4) that a balancing of the equities favors a granting of the injunction. Waterbury Teachers Assn. v. Freedom of InformationCommission, 230 Conn. 441, 446 (1994). The power to issue injunctive relief should be exercised cautiously and only when it is clear that demanding circumstances exist. Anderson v. Latimer Point ManagementCorporation, 208 Conn. 256, 262 (1988).
For the reasons that follow, this court denies the plaintiff's motion for a temporary injunction.
The first and paramount issue to be determined in this case is whether there is an existing trade secret that meets the criteria of § 35-51
(d). Elm City Cheese Co. v. Federico, 251 Conn. 59, 70 (1999). The court must also determine whether Wentworth has any confidential or proprietary information that should not be disclosed. These are questions of fact. Id. at 68-69. The nature and scope of the trade secret and the CT Page 14701 confidential information are also questions of fact. Id. at 73.
The plaintiff maintains that everything connected with its manufacturing of a VPC, including the types of materials used and the material suppliers, are trade secrets and confidential information. The plaintiff maintains that it has used reasonable efforts to maintain the non-disclosure of these trade secrets and information.
The defendants, on the other hand, claim that much of what the plaintiff claims are trade secrets or confidential information are already well known in the industry or readily ascertainable. They claim, moreover, that the plaintiff has exposed some of its alleged secrets to public view.
In determining whether a trade secret exists, it has long been held that "[m]atters of public knowledge or of general knowledge cannot be appropriated by one as his trade secret." Town Country House Homes Service, Inc. v. Evans, 150 Conn. 314, 318 (1963). Further, "`[a]n employee has a right to grow with his experience, and he can carry away for general use his skill and everything that he has learned at his place of employment, except trade secrets.' A.B.A., Trade Secrets: A State-by-State Survey (A. Pedowitz R. Sikkel eds., 1997) p. 147. . . ." Elm City Cheese Co., supra, at 105 (McDonald, J., dissenting).
 FACTUAL FINDINGS
The court heard testimony from the following witnesses who were called by the plaintiff: Francis McQuade, who is employed in management by Wentworth; Claudia Bayer, an employee of Wentworth's; Constance Miller, an employee of Wentworth;[3] John de Los Santos, who was employed by Wentworth until July, 2001, and since October, 2001, has been employed as the general manager for the defendant, Probe 2000, and is now a named defendant; and Phillip Truckle, who is vice-president of Wentworth and also owns three percent of its stock. The parties also introduced numerous exhibits, including printouts from various internet web sites and the confidential and non-disclosure agreements between Wentworth and the individual defendants. At the end of the plaintiffs evidence, the parties submitted briefs on the issue of whether the plaintiff had met the threshold requirements needed to gain temporary injunctive relief.[4]
Based on the testimony and the exhibits, the court makes the following findings of fact.[5]
A VPC is a device that is used to test the circuitry of computer chips and will test numerous chips at the same time. The first VPC was developed and patented by IBM over twenty-five years ago. The patent has CT Page 14702 now expired. At the present time, there are numerous other companies that build VPCs.
Broadly stated, a VPC connects the tiny circuits on a computer chip to a larger testing device which then tests the circuitry of the chip. To accomplish this, a VPC must make contact with each and every contact point on a computer chip. This is done through the use of ultra thin copper wires. The gauge of these wires depends upon the needs and specifications of the customer. These wires, or "probes," may be plated according to the needs of the customer or they may be purchased "off the shelf' from a vendor. The ends of these wires may be pointed or flat.
In order to achieve the necessary contact, the wires are passed through the holes drilled in a "lower die." The number of holes will vary with the project but there can be anywhere from 2000 to 5000 holes required for a VPC. The size and location of these holes is critical and must conform exactly with the gauge of the wire used and with the contact points to be reached on the computer chip. Accordingly, the micro-drilling of the holes must be extremely precise. The microdrilling may be done by the VPC manufacturer or it may be sent out to a vendor that specializes in micro-drilling.
After the drilling, the wires are inserted and soldered into place and the top of the die is "lapped," which is essentially a smoothing out of the surface. At some stage, the excess solder is then melted off. More wires, which are insulated in different colored "sleeves," are then connected to an "upper die" which has a "mylar" or "film" that holds the wires. These holes must match the holes on the lower die. The thickness and tolerances of the film are critical as are the size and location of the holes drilled into the film. More wires are then used to connect the VPC to the testing devices. An epoxy is also used to hold some of the wires in place.
Each VPC must conform to the specific computer chip to be tested. In this regard, the computer chip companies that contract for the building of a VPC may demand that only certain materials be used in the VPC. Indeed, much of how a VPC is built is dictated by the customer's specifications. Thus, the drilling requirements, materials and tolerances for each VPC will differ. Consequently, each VPC is unique because it is custom built for the customer. In addition, computer chip companies also desire to have more than one supplier of VPCs in order to insure supply and to keep the VPC companies competitive. In this regard, the computer chip companies will supply the same specific requirements to each of its VPC suppliers. CT Page 14703
Wentworth began manufacturing VPCs in 1995. At one time, Wentworth was licensed by IBM to build VPCs for IBM's internal use and all of Wentworth's initial knowledge about VPCs came from IBM. Wentworth now does its own microdrilling with its own custom developed drilling equipment. Wentworth has its own procedure for plating the probe wires which varies with the particular customer's needs. Wentworth also claims that its lapping process is unique. Wentworth admits that the oven it uses for melting the solder has its own temperature profile and that the necessary oven temperature would vary with the type of oven used.
In some projects, Wentworth calls upon outside vendors to do some of the design work for a VPC and its competitors also call upon the same outside vendors. Wentworth claims to have developed all its techniques and material requirements for building a VPC through experimentation and trial and error.[6] To create a new generation VPC may take Wentworth from six months to a year.
Wentworth has "hundreds" of different processes that are involved in the manufacture of a VPC. Wentworth has created and has reduced to writing a Standard Operating Procedure (SOP) for each process. Among those who helped create these SOPs were the defendants, de los Santos, Cholin, and Kulkieka, who were part of the manufacturing and engineering group at Wentworth. These SOPs are updated from time to time as new or different methods are employed; some of the SOPs were changed in June, 2002.
These SOPs, some of which are in evidence, are extremely detailed and carry a multitude of steps. In order to build a "Wentworth VPC," the SOPs must be followed in the precise order set forth. If there is any deviation from the SOP, the product will not work. The SOPs are used on a daily basis at Wentworth.
It is conceded by all parties that it is not possible to memorize all the different steps of the SOPS. Having reviewed the SOPs in evidence, the court agrees with this assessment. Indeed, with commendable candor, McQuade admitted that a person would need more than just the same raw materials used to build a "Wentworth VPC," because the task could not be accomplished without following all the SOPs exactly. Thus, it is impossible to duplicate a "Wentworth VPC" from memory alone. In addition, some of the SOPs are "equipment specific" in that, for example, unless the same oven is used to melt solder, the SOP for the process will not be valid.
Two of the most important values in the VPC industry are quality control and "on time delivery" performance. Wentworth believed that it CT Page 14704 created a superior VPC because of the methods it used in its manufacture which, in turn, gave Wentworth a competitive edge in the market. Thus Wentworth considered everything, including its SOPs, to be their "trade secret."[7] Wentworth took substantial steps to safeguard the SOPs. The SOPs were maintained on Wentworth's internal computer system and their access was limited. Some of the defendants had "read only" access and that was further curtailed to their particular area of employment. In addition, SOPs were kept in a specific department for their safekeeping. All hard copies of the SOPs (the number of which were limited) were stamped "confidential." Access to Wentworth's buildings was safeguarded also. Moreover, Wentworth had all their employees sign the aforementioned nondisclosure and non-competition agreements, and their vendors and customers also sign confidentiality agreements.
Wentworth admits, however, that the VPC specifications demanded by a customer are not the trade secrets of Wentworth. Wentworth further admits that some of its competitors may use the same vendors as Wentworth. Wentworth also admits that at least one competitor other than Probe 2000, makes a "similar" VPC in terms of both looks and performance. In addition, Wentworth's web site lists some of the materials that are used in the manufacture of its VPC.
The web sites of both industry vendors and competitors contain information about materials that Wentworth uses in its VPC. DuPont, for example, lists one of these materials as useful for holding wires in place and even carries a picture of the material being used in that fashion. A micro-drilling company's web site carries a picture of micro-drilling into one of the materials that Wentworth uses in one of its dies. Other web sites carry information about plating, soldering, tip angles on probes, as well as providing pictures and information about various VPC components.
With regard to the defendants in this case, the court finds that the defendant, John de los Santos, was employed by Wentworth in 1993, and left briefly before rejoining Wentworth in 1995. He was promoted to director of manufacturing in July, 1998. While there, de los Santos oversaw and was learned in most areas of VPC manufacturing. He was also involved in creating some of the SOPs.
In July, 2001, de los Santos left Wentworth rather then take what he considered demotion. He then went to work briefly for Pratt Whitney. While at Pratt Whitney, he was contacted by one of Wentworth's customers as well as by several of Wentworth's competitors. In September, 2001, de los Santos was contacted by Probe 2000 regarding employment and starting a VPC manufacturing facility on the east coast. CT Page 14705 After some discussions, de los Santos accepted Probe 2000's offer and became its general manager in October, 2001. In October, de los Santos had lunch with McQuade and informed him that he was now working at Probe 2000. There is no evidence that de los Santos ever physically misappropriated any of the SOPs.
The defendant, Zibigniew Kukielka, was employed by Wentworth as a manufacturing engineer. While there, Kukielka wrote and developed SOPs. Apparently he left or was laid off from Wentworth in the fall of 2001. He was hired to work at Probe 2000 by de los Santos in December, 2001. There is no evidence that Kukielka ever physically misappropriated any of the SOPs.
The defendant, Sina Yang, was employed by Wentworth as a micro-assembler. Apparently she resigned or was laid off in the fall of 2001. She was hired by Probe 2000 in May, 2002. There is no evidence that Yang ever physically misappropriated any of the SOPs.
The defendant, Lynn Cable, was employed by Wentworth as a soldering technician. Apparently, she resigned or was laid off in the fall of 2001 and worked for some time after that in a nursing home. She was hired by Probe 2000 in May, 2002. There is no evidence that Cable ever physically misappropriated any of the SOPs.
The defendant, Jeffery Cholin, was employed by Wentworth as a manufacturing engineer, reporting to Kukielka. He was involved in the development of some SOPs. He apparently resigned or was laid off in the fall of 2001. Cholin was never an employee of Probe 2000, but was hired as a temporary consultant for a total of forty-nine (49) hours. There is no evidence that Cholin ever physically misappropriated any of the SOPs.
The defendant, James Cook, was employed by Wentworth as a production supervisor and as a the machine shop supervisor. He apparently left or was laid off in the fall of 2001. Subsequently, he was hired by Probe 2000 for his experience in machining, even though it does not have a machine shop at the present time. There is no evidence that Cook ever physically misappropriated any of the SOPs.
At different times, each of the individual named defendants, while in the employ of Wentworth, signed a "confidentiality and non-competition agreement" as well as a document called a "Confidentiality, Trade Secret and Patent Assignment Agreement." With the exception of the non-competition agreement signed by Gramolini, all the documents are substantially the same. The non-competition agreement signed by Gramolini in October, 2001, differs in that Wentworth had added the name of Probe CT Page 14706 2000 to the list of its competitors. From this the court finds that Wentworth knew in October, 2001 that Probe 2000 was a direct competitor and that based on de los Santos' conversation with McQuade, that Wentworth knew that he was a Probe 2000 employee.
Probe 2000, itself, is a California corporation with a new facility in Tolland, Connecticut, which is more than fifty miles from Wentworth's facility in Brookfield, Connecticut. At the present time, it has only one customer for its VPC. That customer is also a customer of Wentworth's. This customer contracted with Probe 2000 in January of 2001 for the manufacture of a VPC. This customer had specific demands regarding the kind of material to be used in the lower die as well as the gauge of some of the wires and the sleeving on other wires. In addition, the customer required the use of a clear epoxy.
To create the required VPC, Probe 2000 used one outside vendor to do the micro-drilling, another to do part of the design, and another to provide "off the shelf' probes. Probe 2000 did use the same materials for the upper die, the holding film, and epoxy as Wentworth uses to make its VPC.
John de los Santos testified that in building the VPC, the "lapping" was done by Kukielka using micro-lapping paper and a tool that he had designed and manufactured for that job. In addition, the upper die material was recommended by the micro-drilling company. This is the same micro-drilling company whose web site showed this exact same material being micro-drilled. As to the use of the same epoxy, de los Santos testified that because the customer required a clear epoxy, this narrowed the number of available materials and that the one chosen was the only feasible choice. At the end of July, 2002, Probe 2000 completed and delivered the VPC for testing.
Based upon all of the foregoing, the court finds that the materials used by Wentworth in the manufacture of a VPC are not trade secrets or confidential information because (1) some of these materials have been disclosed to the public by Wentworth; (2) all of the materials are readily ascertainable by others through proper means, such as the internet; and (3) all of the materials are well known to the industry as proper materials to use in a VPC.
The court does find that Wentworth's SOPs are trade secrets and confidential information of Wentworth in that they constitute a formula, process or method for manufacturing a VPC from which the plaintiff derives economic value, and that the SOPs are not readily ascertainable to others by proper means. The court also finds that Wentworth has taken reasonable CT Page 14707 care to maintain their secrecy.
The court also finds that the defendants have not misappropriated Wentworth's trade secrets or confidential information, nor is there any threat of this. There is neither evidence that the defendants physically took any SOP, nor is it possible for them to have recreated the SOPs from memory. In fact, some of the SOPs were altered after all of the defendants left Wentworth's employ, and there is no evidence that the defendants have been privy to the new SOPs. Moreover, there is no evidence that Probe 2000 possesses the same exact type of equipment as Wentworth so that the SOPs, even if misappropriated, could be utilized effectively. Indeed, the evidence shows that Probe 2000 used different methods or processes to build its VPC such as using outside vendors for some of the tasks that Wentworth performs inhouse. Nor does the fact that Probe 2000 created a VPC in about six months indicate that the defendants are guilty of the misappropriation of any trade secrets or confidential information, because six months is consistent with the time it takes Wentworth to manufacture a new VPC.
Therefore, turning to the merits of the motion for a temporary injunction, the court finds (1) that the plaintiff has not suffered and will not be threatened with irreparable and imminent injury, because its trade secrets have not been misappropriated and that this is buttressed by Wentworth's delay in bringing this action when it knew that in October, 2001 that de los Santos had gone to work for a direct competitor; (2) that the plaintiff has an adequate remedy at law in that it can still pursue its claims at a full trial on the merits; (3) that the plaintiff is unlikely to succeed on the merits, because the court has found no evidence that any of the defendants misappropriated any of the plaintiffs trade secrets or confidential information, nor is there any threat of this; and (4) that a balancing of the equities does not favor a granting of the injunction, because it would essentially put Probe 2000 out of business and cause its employees to be laid off prior to a full hearing on the merits.
For all the foregoing reasons, the plaintiffs motion for injunctive relief is denied.
 _________________ Fischer, J.